KNOLL, Justice.*
11 This opinion concerns a proceeding to involuntarily terminate the mother’s parental rights to her minor child, H.A.B., filed by the State of Louisiana, Department of Social Services, Office of Community Service (OCS). Pursuant to La. Child. Code art. 1015(5)/ the District Court permanently and irrevocably termi *347 nated S.B.’s parental rights. The Court of Appeal reversed the District Court’s judgment, finding OCS had not proven its case for termination by clear and convincing evidence pursuant to La. Child. Code arts. 1015(5)[1] and 1036. We granted certiorari to determine the correctness vel non of the appellate court’s reversal, and most particularly its finding S.B. complied with her case plan, where the mental health experts testified S.B. has not shown improvement, H.A.B. is at risk staying with his mother given his own mental health issues, and it is in his best interests the mother’s parental rights be terminated. State in the Interest of H.A.B., 10-1111 (La.6/2/10), 38 So.3d 289. After a careful and thorough review of the record and the law, we conclude for the reasons expressed below the Court of Appeal erred in its reversal. Therefore, we reverse its judgment, and we reinstate the District Court’s judgment, ^permanently and irrevocably terminating S.B.’s parental rights pursuant to La. Child. Code art. 1015(5).
FACTS AND PROCEDURAL HISTORY
On April 15, 1999, H.A.B. was born to S.B. and an unknown father. From the outset, H.A.B.’s young life has been a transient one, subject to numerous OCS investigations.[2] The first investigation directly involving his welfare arose from a complaint made against his mother in Allen Parish on March 5, 2004. The complaint was for chemical dependency and was coupled with allegations of over-medicating. Evidence indicates prior to the complaint an ambulance was called to the home on October 3, 2003, October 23, 2003, October 29, 2003,. and February 7, 2004, in response to reports H.A.B. was having seizures. The child was transported to the hospital on October 3, 2003 and October 23, 2003, but the mother requested he not be taken to the hospital on October 29, 2003 and February 7, 2004, after the ambulance arrived.[3] The case was eventually closed when mother and son moved without informing the agency of their whereabouts.
Then, on August 9, 2004, a complaint was made for medical neglect and lack of adequate supervision in Jefferson Davis Parish. Again, there were allegations of JjOver-medicating by S.B. On September 7, 2004, a valid finding of alcohol and drug *348 abuse was made. Parenting, medical assessments, and psychiatric evaluation services were provided to the family for seven months from August 2004 until March 2005. OCS did not seek to remove H.A.B. from his mother’s custody during this time.
While OCS was still providing services in conjunction with the August 2004 complaint, another valid complaint was made against S.B. on February 7, 2005, again in Jefferson Davis Parish, for neglect and dependency.[4] H.A.B. was admitted into Crossroads Regional Hospital on March 4, 2005, for the chief complaint of depression. According to hospital records, S.B. expressed her concerns regarding H.A.B.’s medication and reported H.A.B. violently struck her and threw things at her “with potential for violence against others.”[5]
On March 9, 2005, OCS received another report H.A.B. was being physically abused and neglected by his mother. H.A.B. was removed from S.B.’s custody on March 11, 2005, and was placed in a foster home from March 14 until March 25, 2005, at which time he was admitted to Lake Charles Memorial Hospital’s Adolescent Unit of Psychiatric Services (Lake Charles Memorial). He was released from the hospital on March 31, 2005, and returned to foster care until he was again admitted to the hospital on April 23, 2005. On April 29, 2005, H.A.B. was released from the hospital, but because no foster home was available, H.A.B. was placed in The Children Shelter. On May 17, 2005, H.A.B. was placed in a Restrictive Care Facility in the Baton Rouge area known as Parker House. On May 19, 2005, the District Court adjudicated H.A.B. a Child in Need of Care.
|4The various OCS reports and affidavits in this matter indicate H.A.B. stated his mother, his mother’s boyfriend, and his maternal grandmother “always whip him with ‘a deep fryer belt’ on his legs.” Circular bruises in different stages of healing were observed on his legs. He also reported his mother gave him “diabetic medicine and nose sprays” and her pain pills called “ ‘Somas,’ to make him feel better.”[6] Information obtained from the women’s shelter, where S.B. and H.A.B. resided for a period of time, revealed S.B. had relied on shelter staff to see to her son’s basic needs of being properly fed, bathed, and changed. Concerns were also raised regarding H.A.B.’s sharing of information with his fellow classmates about the rape of his mother by someone she allowed to stay in her home. The content of this story was “very inappropriate for his age and should not have been revealed to the child by his mother.” Moreover, it was reported H.A.B. had missed a total of more than fifty days of school since it began in mid-August, and his principal and teacher expressed concerns his “home environment is not contributing to this child achieving his potential.” Both observed S.B. “is not able to control [H.A.B.]’s behaviors.”
’ Additionally, the reports indicate Dr. Mark Clawson, H.A.B.’s physician, documented H.A.B. “is totally out of control in *349 the presence of his mother. The boy gets into everything and ignores his mother’s attempts to discipline. The child has even run out of [the] office into the street and was almost hit by a car.”[7] This “out of control” behavior in the presence of his mother was also observed and documented | ¿by H.A.B.’s psychiatric counselor, John Morgan, who expressed concerns about the relationship between H.A.B. and S.B.[8]
On May 11, 2005, S.B. submitted to a psychological evaluation with Alfred E. Buxton, Ph.D., M.P., who recorded the following impressions and recommendations:
Although [S.B.] reports she attended 2½ years of college she is only marginally literate at this point in time with an academic skill base at about the middle 6th grade level of mastery. Currently she functions in the borderline range of general intelligence with indications that native ability might be as high as dull normal or low average functioning. Adaptive daily living skills are within acceptable limits of general expectancy at this point in time. She is regarded as being marginally competent as a manager of her own personal affairs. Clinically she would present with the chronic pain with degree of impairment mild to moderate and prognosis guarded and despite her reports of chronic pain she also then contradicts herself by indicating that she has been quite physically active and busy. This type of contraction would not be uncommon given her mental health makeup. She would present with Bipolar Disorder (DSM-IV, 296.70) with degree of impairment mild to moderate and prognosis guarded and perhaps more significantly a Personality Disorder, Not Otherwise Specified (DSM-IV, 301.90) with strong histrionic and borderline features. Outpatient mental health intervention to deal with chronic pain, the Bipolar Disorder, and the characterological defects would be appropriate. In addition to the use of any psychoactive medication counseling would also seem to be warranted. Such intervention can be expected to be long-term as opposed to brief and even with these interventions the prognosis would remain guarded. Because of the nature of the problems presented by her six year old [sic] child, even were she to be in good functional status he would be at above average levels of risk of neglect and abuse just due to the degree of demand he places on a caregiver. When one couples this with her mental health difficulties then the at risk of abuse increases even more so and this risk is further augmented by childrearing beliefs and attitudes which in and of themselves would place a child at risk of abuse and neglect with her functioning as a caregiver. This would not preclude the child being returned to this mother for her to function as a giver of care to that child. However, one would suggest that the greatest chances of success would be for her to secure and maintain mental health intervention services for her functional problems as well as for her to be involved for the long-term in mental health treatment and management and behavioral management of her minor aged child. With feedback from treating professionals and intervention *350 ists that indeed she has engaged receipt of such services and is making adequate progress ^toward treatment goals and objectives then perhaps placement of her minor aged child in her care would be appropriate. Once this is done then monitoring by the agency for a duration of not less than six months in order to assure the general welfare and well-being of that minor aged child would be appropriate. In the absence of receipt of such feedback then the at-risk nature of that child would remain relatively unchanged and maintenance of current living arrangements would be appropriate. That same day, H.A.B. was evaluated by
Dr. Buxton, who opined:
[H.B.] is a 6 year 1 month old [sic] white male resident of Jennings, Louisiana, seen on May 11, 2005, as per the request of [OCS]. Intellect is of at least average general intellectual ability with commensurate adaptive daily living skill development. Level of competency appears to be age appropriate. Clinically he would present with an Attention Deficit Hyperactivity Disorder (DSM-IV, 314.01) with degree of impairment moderately severe and prognosis guarded and perhaps more significantly an Oppositional Defiant Disorder (DSM-IV, 313.81) with degree of impairment severe and prognosis guarded. It is the Oppositional Defiant Disorder that would make him most difficult to manage for adult caregivers. This is not to downplay the significance of the ADHD, it is just simply that the ADHD would be more manageable were there not to be the case of him having severe Oppositional Defiant Disorder. Long-term outpatient mental health intervention service would seem to be appropriate. In addition to the use of any psychoactive medication counseling would seem to be warranted. Such counseling should be frequent and probably will prove to be long-term in nature. Counseling should emphasize such things are better management control, better compliance with commands, better interpersonal skill development, etc. Consultation with caregivers regarding behavioral management issues and strategies (eg, establishment of tight behavioral structure, close direct supervision with clear consistent concrete consequences, etc.) would also seem to be appropriate. Even with these interventions the long-term prognosis would remain somewhat guarded. These recommendations would stand regardless of his living arrangements. It should be noted that such a child places a great deal of demand on a caregiver and because of this demand that he places on a caregiver he would be at above average levels of risk of neglect and abuse regardless of the caregiver that he would be placed with at any given time. With provision of the aforementioned services perhaps the at-risk nature of this child could be maintained within acceptable limits of expectancy given the nature of his functional problems. If, and when, he is returned to the care of the birth mother then monitoring by the agency for a duration of not less than six months in order to assure the general welfare and well-being of this minor aged child would be appropriate.
17After approximately sixteen months in Parker House and completion by S.B. of her OCS case plan,[9] H.A.B. was returned *352 to his mother on September 7, 2006, |Rupon the recommendation of neuropsychologist, Lawrence S. Dilks, Ph.D., who examined S.B. on May 23, 2006, and noted:
Despite the client’s handicaps, she has fulfilled all the requirements set forth by [OCS]. She has maintained recovery for approximately one year, with the exception of drinking one beer several days ago. Considering the fact that the client completed all her recommendations, it is recommended her child be returned to her. It should be noted, however, that [S.B.]’s psychiatric condition is extremely fragile and she will be an individual who will require assistance in parenting for the long-term. This is not an individual who is capable of functioning at an appropriate level without some form of assistance from time to time. Close monitoring by [OCS] is certainly warranted.[10]
19An OCS report, dated September 5, 2006, documented H.A.B. was making straight A’s, and he and S.B. were currently doing very well: “S.B. has made impressive changes and her parenting skills reflect her hard work and dedication over the last year.” In compliance with Dr. Dilks’s recommendation and the District Court’s order, OCS maintained supervision for three additional months.
The events leading up to the present termination proceeding then occurred on December 9, 2007, when witnesses contacted OCS to report S.B. struck H.A.B. with her vehicle[11] while H.A.B. was riding his bicycle. The record reveals her vehicle actually rolled over the front tire of his bike, but H.A.B. was able to jump off the bike before impact. S.B. then exited her vehicle and slapped H.A.B. several times about the head and face. S.B. physically attacked both a bystander, who intervened, and the police officer, who responded to the scene. H.A.B. attacked the officer as well, and when placed in the back of the police car, he tried to “kick” the window out, but settled down once his mother was placed in the car with him.
S.B. later explained H.A.B. was running away from home following a confrontation they had after church, and she only cut off H.A.B. with her car to keep him from being run over by a truck because his bike had no brakes. S.B. was originally charged with attempted vehicular manslaughter, child abuse, battery of an officer, and battery. She was also charged with threatening a state official arising from her statement, “I know where that bitch lives,” and her conveyance of | minformation about an OCS case worker’s home and family.[12] However, all charges were later dropped.
*353 OCS initially placed H.A.B. in Lake Charles Memorial from December 9 through December 19, 2007, because H.A.B. was “a risk to himself and others.” [13] Given H.A.B.’s history of admissions and his medical team’s familiarity with his family, it was “strongly recommended” by his psychiatrist, Dr. Charles Murphy, H.A.B. be restricted from personal contacts with his mother as such contacts were believed to be “detrimental to his medical psychiatric condition and overall well-being.” H.A.B. was placed in a foster home once discharged from the hospital, but the next evening the child became violent, presenting a risk to himself and others, and was re-admitted to Lake Charles Memorial.
Although the foster family visited the child daily and wanted to retry the placement, H.A.B. was again removed from the home shortly after discharge. Thereafter, on January 8, 2008, H.A.B. was placed with the Botleys, and from then on, his conduct “radically improved.” He started making A-B honor roll each six-week period and receiving awards for good behavior. His principal and his teacher wrote letters to OCS expressing how well he was doing.[14] He also enjoyed extracurricular, activities, like baseball, and attended church regularly. In several OCS reports, it was indicated H.A.B. was for the first time allowed to be a kid and |nwas acting like one.[15] Most remarkably, H.A.B. in the Botleys’ care was no longer on any medication.[16]
On or about January 9, 2008, a case plan for the return of the child to his mother was formulated by OCS.[17] Then, on Janu *354 ary 25, 2008, S.B. threatened bodily 112harm against two OCS case workers for which offense she pled guilty to the felony of “intimidating a witness” on June 24, 2008. The District Court deferred imposition of sentence, placing her on probation for eighteen months with special conditions.
On February 8, 2008, Dr. Buxton again examined S.B. at OCS’s request and made the following observations and recommendations:
Certainly outpatient mental health intervention to deal with the Bipolar Disorder, the Parent-Child Relational Problem, her pain complaints, and her characterological defects would be appropriate. In addition to the use of psychoactive medication counseling would seem to be warranted. Such treatments are likely to prove to be long-term as opposed to brief given the nature of the problems confronting this individual and their chronicity. Even with these interventions the prognosis would remain fair to guarded. One would certainly have to question her compliance with treatment recommendations within recent months. She currently seems to be experiencing hypomania. Even were she to comply with treatment recommendations she would still have a difficult time fully managing the behavior of her 8 year old son who presents with his own set of mental health issues and behavioral disruption issues. It should be noted that the first thing one would want to do is stabilize her from a mental health perspective and then establish that she is able to perform in a consistent basis over time as a manager of her 8 year old son’s behavior. Seemingly this has not thus been demonstrated by *355 this individual. If, not until there is feedback, from mental health interventionists that her mental health status has shown good approach toward treatment goals and objectives and that she has been stabilized from a mental health perspective for a duration of not less than nine |1smonths, would one suggest that her child be returned to her full-time regular care. If indeed there is feedback from treating professionals and interventionists that she has made adequate progress toward her treatment goals and objectives then one would want to see her become intimately involved in the mental health care and behavioral management issues relative to her minor aged child. One would also want feedback from treating professionals and interventionists that she is able to implement and maintain sound behavioral management practices with that minor aged child. With feedback that her mental health status is good and stable and that she is able to adequately implement and maintain behavioral management practice for her minor aged child, then return of that child to her full-time regular care could be considered by the agency. Once the child would be returned to her full-time regular care then monitoring by the agency for a duration of not less than six months would be appropriate. Certainly until that point in time visitation would not be precluded between this birth mother and her birth child....
On March 13, 2008, H.A.B. was adjudicated a Child in Need of Care. OCS’s June 6, 2008 report noted H.A.B.’s visits with S.B. were adequate, but after each visit, H.A.B. reverted to “old” behaviors. The report also indicated the goal of OCS’s case plan had changed from reunification to termination, but stated the agency would recommend continued contact after adoption, acknowledging “[H.A.B.] obviously loves his mother and [S.B.] obviously loves [H.A.B.].”
Sometime in October 2008, S.B. began to attend the Botleys’ church on Sundays and was allowed to .visit with H.A.B. The length of these visits increased, and in December, S.B. would leave the church facilities with H.A.B. for hours at a time, going to the movies, restaurants, or the home S.B. shared with her fiancé, Larry Breaux, in which home S.B. reported to OCS she took up permanent residence in January of 2009. However, these visits were not approved by OCS and were terminated when OCS learned of their occurrence after S.B. made a formal complaint against the Botleys’ for their use of corporeal punishment on H.A.B.[18] Visitation 114between H.A.B. and S.B. was then reduced to “one (1) hour per month strictly supervised.” In response to this reduction, S.B. filed a motion to modify visitation.
An investigation of the Botley complaint revealed H.A.B. had started acting out, which included two behavioral incidents at school, beginning in October after the unsupervised visitation with his mother increased. Additionally, even though Mr. Botley admitted to the use of a lattice stick on H.A.B. for his “disrespect and acting out,” H.A.B. was not removed from the home.
On February 10, 2009, OCS filed its Petition for Certification for Adoption and Termination of Parental Rights, seeking termination of S.B.’s parental rights based on La. Child. Code art. 1015(5),[19] which provides:
*356 The grounds for termination of parental rights are:
[[Image here]]
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
As its reports indicate, OCS was concerned for the stability and welfare of the child, even though S.B. complied with her case plan and sought out resources:
It is a major concern for the agency that [S.B.] is unable to appropriately and safely parent her son, [H.A.B.]. The agency has spent many months and a significant amount of money trying to stabilize the family. The agency has put every available resource into the family. The family is somewhat stabilized while the agency is involved. However, once the agency withdraws from the family, it becomes extremely and dangerously unstable. The agency still has concerns about contact between parent and child. After the child has contact with his mother he reverts back to “old” behaviors. The child has Undisclosed to the foster parents that his mom “tells him negative things”. The child has disclosed that his mother has told him that they must go to the hospital to get medications. After contact the child sometimes urinates in the bed. [S.B.] has been caught whispering in the childs [sic] ear, when she has been well informed of the rules of visitation, one being no whispering. After that incident the child acted out. The worker has observed that there is still not a healthy parent child relationship and the agency feels that there is nothing it can ever do to change it.
On March 6, 2009, Kevin Scott LeJeune, a licensed professional counselor and marriage and family therapist, issued a report to OCS on the eleven individual/foster family therapy sessions he conducted with H.A.B. and the Botleys:
After securing a release of information, I obtained [H.A.B.]’s school records and his Psycho-educational evaluation. A review of educational records reveals that while living with his biological Mother, [S.B.], [H.A.B.] was transient, and attended numerous schools. Attending numerous schools makes a review of records difficult, as one can imagine, but more importantly, it hinders the educative process. From the records I reviewed, it appeared that [H.A.B.] attended Head Start (Kinder), Oberlin Elementary School, J.I. Watson (Iowa), J.F. Kennedy (Lake Charles), Elton Elementary School, Pine Prairie High School (K-12), Live Oak Elementary (Lafayette) and Broadmoor Elementary in East Baton Rouge Parish.
[H.A.B.] was found to be eligible for special education services by the Calca-sieu Parish Pupil Appraisal Services on January 9, 2007. His special education exceptionality was listed as Emotional Disturbance with medical diagnoses of Attention Deficit Hyperactivity Disorder *357 comorbid with Oppositional Defiant Disorder, Bipolar Disorder, and Conduct Disorder. He was prescribed psychotropic medications as part of the treatment for these conditions. At that time, [H.A.B.] displayed serious disruptive, aggressive, and inappropriate behaviors to meet diagnostic criteria for these mental health conditions listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM IV TR), and special education eligibility (Bulletin 1508). Furthermore, in January 2008, he was placed on Special Education-Homebound services.
During [H.A.B.]’s stay with the Botley’s, he has made dramatic improvements. To name a few of his accomplishments, a) he has lived in the same home for more than one year, b) he has not had a single discipline infraction at school, c) he has achieved A/B Honor Roll every six-weeks grading period, d) he no longer receives special education services, and e) he no longer takes psychotropic medications. [H.A.B.] is proud of his behavioral and academic accomplishments (and should be)! These are astonishing improvements by anyone’s standards.
After working with [H.A.B.] I feel that he is an extremely bright boy with great potential for success under the right circumstances. He is |10aware that his Mother’s parental rights may be terminated, and reports receiving conflicting information from his mother, OCS workers, and the Botley’s [sic]. There appears to be an increase in defiant, and acting-out behavior (at home and school) after visits with his mother. However, he has not related to me that she has encouraged him to misbehave. The increase in acting-out behavior may be a symptom of his anxiety with the situation, or a result of differing structure and rules between the Botley’s [sic] and his Mother. As one would expect, he loves his mother and would miss her should her parental rights be terminated. He is saddened by her condition and the situation surrounding his removal. However, his is resilient and appears healthy, well adjusted, and integrated into the Botley family. He is comforted knowing that, if adopted by the Botley’s [sic], he would be allowed to have contact (at least limited) with his mother....
On March 12, 2009, S.B.’s motion to modify visitation was heard by the District Court. During the hearing, Rhee B. Fisher, S.B.’s licensed professional counselor with Jennings Behavioral Health, testified regarding S.B.’s. OCS-required mental health therapy. According to her records, S.B. has chronic mental illness — bipolar, depressed with psychosis. Ms. Fisher testified S.B.’s services began at the highest level in March 2008 (individual therapy three to five hours per week; group therapy twice per week), then went to a moderate level in June 2008 (individual one to two hours per week; group meetings; seeing the doctor), and a lower level in October 2008 (a half hour to one hour every week to two weeks individual; seeing the doctor; no group), decreasing as she improved. S.B. was released from care in January 2009; however, she requested to remain in care until April 2009. According to Ms. Fisher, S.B.’s treatment was scheduled to end on April 19, 2009, with followup outpatient programming for administration of medication. To the best of her knowledge, S.B. completed the requirements of her case plan.
Ms. Fisher also explained S.B. was admitted into the hospital in November 2008, because she stopped taking her medication *358 supposedly at OCS’s direction.[20] 117She testified S.B. was motivated to get her son back, but also conceded she had no idea what effect S.B. has or could have on H.A.B.
Candace Kelly, an OCS supervisor, who had worked with the family for seven years, also testified during the hearing. She explained S.B. uses situations to her advantage, but she allowed the “supervised” Sunday church visits and a Christmas visit because of the affection between mother and child. Supervision was always required because “you’ve got to stay right there.... You have to be within feet, not that she’s going to hurt him physically, but she is going to tell this child something.” Her primary concern for H.A.B. was S.B.’s lack of stability as “she’s not self-supporting .... [and] [s]he is dependant on a man with whom she is living.” According to her testimony, the visits during which S.B. was allowed to leave with H.A.B. unsupervised clearly violated the visitation contract S.B. signed, and in her opinion, S.B. “had no intention [whatsoever] of following through the agreement with [OCS] in reference to the visitation.”
CASA volunteer, Patrick Guillory, who was appointed to the case in March 2009, testified regarding his “real” concerns about H.A.B.’s visits with his mother based on his admittedly limited research. The complaint against the Botleys was also addressed during the hearing.[21]
Following this hearing, the District Court denied S.B.’s motion, reasoning:
But let’s get to the issue at hand that has to deal with the additional visitation request by [S.B.] with her minor son. The Court looked at the report whereby it was stated that there should be no 11svisitation with the minor child. This was I believe in 2007. The record is filed [sic] with documentation showing that the minor child had all types of problems, had a lot of issues to be addressed. The Court has reviewed, in the record, a previous report dated December 8th from Counseling & Consultation Services at our review hearing on December the 11th showing that the minor child in the Botley home was doing wonderful, was not on medication, doing great in school, and everything was going wonderful at that time.
Subsequent to that report and that date is when ... [S.B.] went to the ... church where the foster parent was living, started going there, started to ask for visitation with the child knowing good and well that she was not supposed to be there and she was not suppose to have visitation with child. There’s always been an all — there’s always been concern about [S.B.]’s influence over the minor child by manipulating the child. The — this is a prime example of [S.B.]’s ability to manipulate individuals.
Mr. Botley, the Court was furious at you about this incident. Now, the more I have sat and I have thought about this, *359 the — the madder I am about [S.B.] because she manipulated not only the system but she manipulated Mr. — the foster parent in allowing this visitation to occur when it should not have occurred and now we have disrespect issues with the minor child that was not there before these visitations started happening, all right. And so at this time, [S.B.], the Court’s not going to increase your visitation, okay, at this time. All of this was created by you, all right, and the reason we’re here today, and the Court is not going to increase the visitation at this time.
On April 13, 2009, Dr. Buxton again examined S.B. at the request of her attorney and made the following observations:
Continued outpatient mental health intervention certainly would seem to be appropriate. In addition to the use of psychoactive medication counseling would seem to be appropriate and consistent with her history of episodic inpatient care might prove to be appropriate to re-stabilize her and adjust medications. Given the history of this individual such treatment can be expected to be long-term as opposed to brief. Consistent with the opinion back in February 2008 the examiner is of the opinion that even with these interventions the overall prognosis would remain fair to guarded. Consistent with the previous impressions the examiner is of the opinion that it would be difficult for her to fully manage the behavior of her 10 year old [sic] acting-out son with mental health issues on a full-time basis. Certainly visitation with her minor aged child would not be precluded and if indeed her report is accurate that for four months she was having extended contact with her child on a weekly basis for a period of anywhere from 6 to 8 hours, then the examiner would be of the opinion that she probably could return to that schedule of contact with the child. Also arguing against full-time regular care would be that her child-rearing beliefs and attitudes, in and of themselves, would place her at risk of behaving in a neglectful or 119abusive fashion as a caregiver and that the at-risk nature of her minor aged child with her functioning as a full-time caregiver would be at above average levels of risk. It should be noted that although she reports she has been taking care of a 1 and 2 year old [sic] child for her fiancé, her child-rearing beliefs and attitudes remain the same and one would have to be concerned regarding risk regarding those children but of course this was not the reason for this evaluation, this evaluation was relative to her desire to have her 10 year old [sic] son returned to her full-time regular care and/or establish longer visitation periods. It should be noted that when one couples her mental health status with her child-rearing beliefs and attitudes and the mental health and behavioral history of her 10 year old [sic] son, the at-risk nature of that child were he to be placed in her full-time regular care would be at above average levels of risk. Hence, return to her full-time regular care is not recommended by this examiner though certainly frequent and extended visitation would not be precluded....
Then, on April 21 and 22, 2009, the termination of parental rights hearing was held.
At the outset of the hearing, OCS introduced into the record “all previous matters handled” in the case. During the hearing, the District Court heard direct testimony from Dr. Buxton, who was accepted as an expert in the field of clinical and medical psychology. He explained he examined S.B. three times and testified S.B. is bipolar and shows traits of borderline personality and eharaeterologieal disorder. He *360 stated if reunification was to have a chance, S.B. would require twenty-four-hour access to constant help and contact with a mental health professional at least four days per week, although he would prefer seven days of contact per week. Dr. Buxton opined H.A.B. is at great risk staying with S.B., which risk is increased by his own mental health issues and her childrearing attitudes. Regarding these attitudes, Dr. Buxton explained S.B. is able to “divorce” herself from responsibility or blame for any problems that might arise in the rearing of her child and places all responsibility on the child:
Ulfs not me; it’s him, and that’s where his risk then rises because she doesn’t see it as being a problem. It’s him. So whatever happens is a consequence of what he did, not a consequence of what she did or failed to do.
lapln actuality, problems arise “because of a combination of what the child brings ... as well as what the parent brings to the situation.” He also praised S.B. for her apparent honesty during her evaluations.
While Dr. Buxton ultimately recommended termination of S.B.’s parental rights was appropriate because OCS could not realistically provide the intensive therapy and services necessary for S.B. to provide a stable environment and successfully parent, Dr. Buxton advocated continued contact between S.B. and H.A.B.:
We’re getting ready to take something away from that child that’s very important. He’s an only child, and that’s the only parent he knows. And we’re getting ready to take that. And we have no idea of what type of traumatic effect that’s going to have on that child. I know it’s going to have a traumatic effect. It’s unquestionable in my mind it will. There’s no way that you can sever that kind of bond, because although they fought like cats and dogs and carried on and all that, they love each [other]. That’s his blood mother, and that’s her blood son. They love each [other] dearly. She would not be here if she didn’t love that child. She wouldn’t have came see me again if she didn’t love that child. As I said, she’s tried everything.
[[Image here]]
Let him thrive where he’s at as long as he’s not abused or neglected, but allow him to have contact with his mother....
[[Image here]]
I know what I’m saying is kind of radical and unique, but I’ve been doing this for years and years, and I’m frankly just [tired] of seeing us have to be in the situation where we have to sever that only umbilical cord left for that child if there’s someway that we can continue with at least a little bit of it.
Dr. Dilks, who had seen both H.A.B. and S.B. in May 2006, was accepted as an expert in the field of neuropsychology and as a certified rehabilitation expert. In 2006, he diagnosed S.B. as bipolar with anxiety disorder, borderline personality, depression, somatoform disorder, and po-lysubstance dependency. At that time, considering her overall IQ, her completion of her OCS program, and her sincere desire to change, he suggested H.A.B. be returned to her care with the help of OCS services for the foreseeable future. However, based on the information he heard at | aitrial and the various reports, Dr. Dilks now recommended S.B.’s parental rights be terminated. Moreover, Dr. Dilks opined S.B.’s history of failing to change her behavior after being afforded opportunities to do so demonstrates an inability on her part to ever actually change that behavior. Even though she complied with her current case plan recommendations as *361 she had done in 2006, he still could not recommend H.A.B.’s return:
I know this sounds really cold, but, no, I can’t, because I think at some point you have to say that the best interest of the child’s needs outweigh the best interest of the parent’s needs, and I — I think that the lady just has been given many opportunities to make a decision to change her behavior, remain compliance to her treatment programs, and control herself and — and that doesn’t seem to occur....
[[Image here]]
We have a bipolar disorder and a history of drug and alcohol use, and the bipolar disorder is — it’s just intractable.... These are lifelong debilitating disorders, and our technology will allow you to become semi-functional if you treat it aggressively, which requires the active participation of the patient. And what you’re telling me, if I understood you right, is that we’re not in counseling, we’re not in NA, we’re not in AA, and we don’t have a sponsor. Now, I have all — a lot of other questions just like these, but you’ve missed the big — out of the big five (5), you’ve missed four (4). So ... based on everything I’ve heard about today and the reports, I would say no.
Contrary to Dr. Buxton, however, he would “vote” for termination without contact based on all the present data:
[M]y personal experience is that an open adoption does not work very well. It leaves the child in a state of confusion. We either have to make a decision and say the child belongs to this family over here and then we terminate the rights of the other parents, or we have to say we’re going to continue in a foster situation in perpetuity and allow the child to-the child to have contact with the foster family and live with them as their child but maintain contact with the original parents. My experience is that the second, the later [sic], does not work very well. The children always seem to have confusion, behavioral disruptions....
Significantly, he further opined H.A.B.’s ability to function and excel without medication indicated to him the original diagnoses of ADHD and bipolar disorder were likely environmentally stimulated, not organic, meaning H.A.B.’s mental 122condition was affected by “the contingencies that he was working under in the home.... It may have been because of a chaotic environment, and that can occur for many reasons including parental instability, environmental instability....” Possible stimuli were the nine different homes and schools he attended and his mother’s mental conditions.
The District Court also heard testimony from OCS worker, Summer Oyster, who testified OCS believed it was in the best interest of H.A.B. to terminate S.B.’s parental rights. She also explained OCS’s goal was changed from reunification to termination based on OCS’s concerns “that [S.B.] has a behavior pattern of completing all of her ... steps, and then all of a sudden, everything falls apart.” She further testified regarding H.A.B.’s acting-out behavior and the escalation of problems with his behavior after visits with his mother, which included his statements to the effect he did not have to listen to the Botleys because he was going home soon.
Kevin LeJeune, who was accepted as an expert in the field of licensed professional counseling and licensed marriage and family therapy, also testified regarding H.A.B.’s defiance and acting-out behavior at home and in school after visits with S.B. He further testified H.A.B. was on no medication and was stabilized in one school with the Botleys despite of his diagnosis of *362 ADHD, oppositional defiance, bipolar, and conduct disorders. Jennifer Lea Kramer, H.A.B.’s case manager at Lake Charles Memorial, testified regarding H.A.B.’s various hospitalizations and concerning the recommendation made by his treatment team to limit contact with his mother. On cross-examination, she revealed she knew from Dr. Murphy H.A.B. was doing well and was no longer on medication.
Patrick Guillory, H.A.B.’s CASA volunteer, testified it was in H.A.B.’s best interest he not be returned home:
| gjFor me, in the best interest of the child, based upon the limited information I’ve been given, that it is — he don’t be returned back to his mother because looking at everything she does well with supervision, but, you know, without supervision she has — and also she hasn’t shown me that she can support him and herself if, you know, she doesn’t stay with the gentleman who she’s with now. She has no home; no way of supporting him. So in the best interest of the child based upon that and the other factors in the case, I don’t think he should be returned back to her at this time.
[[Image here]]
CASA is asking for termination because [S.B.] appears to do well only with mentoring or others involved in her life. [S.B.] has not provided a stable income or a home to support herself and [H.A.B.].
Notably, on cross-examination, Mr. Guillo-ry admitted he was not aware S.B. received Social Security benefits of $663 a month or that H.A.B. received the same.
Both S.B. and her fiancé, Mr. Breaux,[22] testified H.A.B. would be welcomed in Mr. Breaux’s home and they were willing to do whatever it took to get H.A.B. back. They also both stated S.B. was the primary caregiver for Mr. Breaux’s two great-grandchildren, who were placed in his custody by court order. According to their testimony, S.B. moved in with Mr. Breaux in November of 2008 after having known him for only two months. No wedding date was yet set as they “were just waiting to see how things continue to work for [them].” Interestingly, Mr. Breaux testified he did not really know the reasons why H.A.B. was placed in foster care, and he was not concerned with the allegations regarding S.B.’s parenting skills as he had not observed any questionable behavior in her interaction with his great-grandchildren. Based on what he observed, she was a good caregiver.
S.B. further testified she completed all the requirements of her case plan, even completing two parenting classes because the first class was not OCS approved. She passed all drug screens and was in compliance with her probation requirements. | ^Additionally, she made every visitation and every effort to spend time with her child. It was because of her love for her child and her concern for his safety she reported, at her lawyer’s direction, the abuse she observed, even though both she and H.A.B. knew their visits would be decreased. Still, even knowing of the corporeal punishment administered by the Botleys and her abhorrence to such punishment, she “loved” the family for all it had done for H.A.B., and she continued to provide for H.A.B. with groceries, school supplies, and clothing.
She conceded H.A.B. “will be good wherever he’s at,” but she “just want[ed] to watch him ... grow up ... to be apart *363 of that,” even if “the law has to be there to watch.” S.B. strongly disputed, however, the implication her mental issues cause her son’s behavioral problems. It was also revealed she was released from her Jennings Behavioral Health program because the program was closing, but she was given numbers to other facilities where she could receive Medicaid-funded counseling.[23] Also, she would continue to see the psychiatrist with the Jennings clinic on a monthly basis for administration of her medication.
After taking the matter under consideration, the District Court found it was in H.A.B.’s best interest S.B.’s parental rights be permanently and irrevocably terminated pursuant La. Child. Code art. 1015(5) and H.A.B. be made eligible for adoption.[24] In written reasons for judgment, the District Court stated:
As far back as March of 2005, the Jefferson Davis Parish Office of Community Services had received reports of physical abuse and neglect against [H.A.B.] by his mother. At that time, [H.A.B.] was Lsremoved from his mother’s care. In September of 2006, [H.A.B.] was returned to [S.B.] due to compliance with her case plan and the appropriate behavior modifications. However, on December 9, 2007, the Office of Community Services received a report of physical abuse by [S.B.]. [H.A.B.] had run away from home, and [S.B.j attempted to run him over with her vehicle and then began to hit him, all in front of witnesses. [H.A.B.] was again removed from his mother’s care and placed in State custody. [H.A.B.] continued in State custody, and a termination hearing was held in April of 2009.
The State argues that it has spent many months and a significant amount of time and money trying to stabilize the family; however, once the State withdraws from the case, the parent-child relationship becomes extremely and dangerously unstable. Despite marked improvement while in State care, [H.A.B.]’s behavior deteriorates again once he is placed in his mother’s custody. In his current foster home, [H.A.B.] is doing well, both emotionally and academically, and he is no longer taking any behavioral medication that was prescribed to him prior to the State’s involvement. Consequently, the State filed a petition to terminate [S.B.j’s parental rights on February 10, 2009.
After reviewing the testimony offered at trial, the memoranda offered by the parties, and the evidence provided, the Court finds that termination of [S.B.j’s parental rights are in [H.A.B.]’s best interest. The State has been involved with [S.B.j and [H.A.B.] on at least eight different occasions since [H.A.B.j’s birth. While only some of the incidents were validated by the State, it was evident that [H.A.B.] had significant behavior problems which were exacerbated by [S.B.j’s supervision. [H.A.B.] made great strides in his behavior while in foster care until he was visited by his mother. After contact with [S.B.j, [H.A.B.] would resume his aggressive *364 and manipulative behavior towards others. While in his mother’s custody, [H.A.B.] attended nine different schools, but he has been enrolled in the same school for more than a year now and has improved academically. Dr. Alfred Bux-ton examined [S.B.] and [H.A.B.] on several occasions to determine their mental health, and on each occasion, Dr. Buxton found that [H.A.B.] was at a high risk of being subject to abuse and neglect by [S.B.] because of her mental health and child-rearing attitudes. Dr. Buxton’s diagnosis is that [S.B.] suffers from bipolar disorder and a personality disorder and that she should not be reunified with [H.A.B.]. Dr. Lawrence Dilks also examined [S.B.], and he came to the same conclusions as Dr. Buxton. At the time of the trial, [H.A.B.] had been in State custody for sixteen months, and he has been subject to chronic abuse and neglect since his birth. In addition, [S.B.] has refused long term mental health care treatment that she needs in order to be reunified with her child. Consequently, the Court finds that it is in [H.A.B.]’s best interest that [S.B.j’s parental rights be terminated at this time.[25]
IgfiS.B. appealed the District Court’s judgment, and the Court of Appeal, Third Circuit, reversed. State in the Interest of H.A.B., 09-1218 (La.App. 3 Cir. 4/14/10), 35 So.3d 1170.
After first explaining La. Child. Code art. 1015(5) requires “a showing of (1) a lapse of one year prior to termination; (2) lack of substantial compliance with the case plan; and (3) lack of reasonable expectation of significant improvement in the near future,” the Court of Appeal reviewed the record to determine whether OCS proved all three requirements by clear and convincing evidence. While not disputing the lower court’s finding regarding the first requirement, the appellate court did strongly dispute the trial court’s finding that OCS presented evidence of S.B.’s lack of substantial compliance with her case plan pursuant to La. Child. Code art. 1036(C), which provides:
Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
Specifically, the appellate court found:
Since December 2007, S.B. has done everything OCS asked of her and more. *365 Of the seven factors listed in La.Ch. Code art. 1036(C), there is no suggestion that she failed to attend visitation, failed to communicate with the child or OCS, or failed to contribute to the costs of the child’s care. The record also shows that since December 2007, she has complied with treatment and rehabilitation services in the case | jupian and that the trial court’s finding to the contrary is manifestly erroneous. The record shows that S.B. attended every counseling session or treatment program that the state required of her.
The record also reflects that S.B. “showed substantial improvement in redressing the problems preventing reunification.” While reunification with H.A.B. at this time may not be appropriate, she has done everything she has been asked to do by OCS, and has definitely made substantial improvement. She has stayed off of drugs and alcohol and stayed on her prescribed medication for epilepsy and mental disorders. Finally, because she followed the case plan, many of the conditions that led to removal have been addressed. She has permanent housing and the means to care for H.A.B.
[[Image here]]
The remaining factor is “the persistence of conditions that led to removal.” Clearly, S.B. continues to suffer from mental illness that makes caring for a child difficult. Nevertheless, all the evidence indicates she has taken every step to improve her situation and reunify with her child.
While the opinion acknowledged S.B.’s mental illness will always be problematic in providing a stable environment and fulfilling her role of parenting H.A.B., it seemed to suggest OCS is partially responsible for S.B.’s relapses, as it was ill-equipped to provide the intense therapy she required to effectuate her parental duties. Thus, it would not impute to this mother OCS’s determination she was beyond help. The appellate court further maintained termination was not the appropriate method for accomplishing OCS’s goal. Consequently, the Court of Appeal found the District Court’s ruling was manifestly erroneous because the record evidence demonstrated S.B. substantially complied with her OCS case plan and, therefore, her parental rights should not have been terminated.[26]
*366 IssThis Court must now review the law on the termination of parental rights in conjunction with the record evidence to determine whether the Court of Appeal correctly found the District Court manifestly erred in its termination of S.B.’s parental rights.
LAW AND DISCUSSION
In every involuntary termination of parental rights case, there are two private interests involved: those of the parents and those of the child. State ex rel. J.A., 99-2905, p. 7 (La.1/12/00), 752 So.2d 806, 810. On the one hand, parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000)(“liberty interest at issue ... is perhaps the oldest of the fundamental liberty interests recognized by this Court”); Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982); Lassiter v. Department of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 2160-61, 68 L.Ed.2d 640 (1981). This “commanding” liberty interest, which is “far more precious than any 12flproperty right,” does not “evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.” Santosky, 455 U.S. at 753-59, 102 S.Ct. at 1395-97. On the other hand, however, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care as “[t]here is little that can be as detrimental to a child’s sound development as uncertainty over [where] he is to remain.” Lehman v. Lycoming County Children’s Servs. Agency, 458 U.S. 502, 513, 102 S.Ct. 3231, 3238, 73 L.Ed.2d 928 (1982). While a parent’s interests “undeniably warrant deference and, absent a powerful countervailing interest, protection,” Lassiter, 452 U.S. at 27, 101 S.Ct. at 2160-61, that deference and protection should always bow to the child’s countervailing interests, which our courts have deemed to be superior and paramount. Id.; State ex rel. K.G., 02-2886, p. 5 (La.3/18/03), 841 So.2d 759, 762; State ex rel. J.A., 99-2905 at p. 8, 752 So.2d at 811.
Regarding the State’s solemn role in such proceedings, this Court has aptly provided:
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible pro *367 tection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. La. Child Code art. 1001. As such, the primary concern of the courts and the State remains |anto secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration....
State ex rel. J.A., 99-2905 at pp. 8-9, 752 So.2d at 811.
A State’s interest in finality is unusually strong in child custody disputes. Lehman, 458 U.S. at 513, 102 S.Ct. at 3238. Still, while the State has an “urgent interest” in a child’s welfare and in providing the child with a permanent home, the State’s interest must favor preservation over severance of biological familial bonds as long as there is reason to believe a positive, nurturing parent-child relationship exists. Santosky, 455 U.S. at 766-67, 102 S.Ct. at 1401; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. Thus, parents, who are faced with the possibility of forced dissolution of their parental rights, must be provided with fundamentally fair procedures in order to ensure children’s legal bonds are not erroneously severed from fit parents. Santosky, 455 U.S. at 753-54, 102 S.Ct. at 1395.
In order to adequately protect the parents’ rights in termination proceedings, the United States Supreme Court has held the clear and convincing evidence standard of proof strikes a fair balance between the biological parents’ rights and the State’s concerns for the child’s welfare and placement in a permanent home. M.L.B. v. S.L.J., 519 U.S. 102, 118, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996); Santosky, 455 U.S. at 769, 102 S.Ct. at 1403; State of Louisiana in the Interest of J.M., and M.M., 02-2089, p. 7 (La.1/28/03), 837 So.2d 1247, 1252. “[Sjuch a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process.” Santosky, 455 U.S. at 769, 102 S.Ct. at 1403. However, “the precise burden equal to or greater than that standard is a | S1 matter of state law properly left to state legislatures and state courts.” Santosky, 455 U.S. at 769-70, 102 S.Ct. at 1403.
Our Legislature enacted Title X of the Children’s Code to govern the involuntary termination of parental rights in this state. State ex rel. K.G., 02-2886 at p. 5, 841 So.2d at 762. Its provisions emphasize the primary concern in all termination proceedings is to secure the best interest of the child:
Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if at all possible, to achieve the child’s adoption. The procedural provisions of this Title shall be construed liberally. The proceedings shall be conducted expeditiously to avoid delays in resolving the status of the *368 parent and in achieving permanency for children.
La. Child. Code art. 1001.
La. Child. Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. State ex rel. K.G., 02-2886 at p. 5, 841 So.2d at 762. In order to terminate rights, the court must find the State has established at least one of the statutory grounds contained in its provisions by clear and convincing evidence. See State in the Interest of ML & PL, 95-0045, p. 4 (La.9/5/95), 660 So.2d 830, 832; La. Child. Code art. 1035(A); see also Santosky, 455 U.S. at 769, 102 S.Ct. at 1403. Notwithstanding, even upon finding the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines to do so is in the child’s best interest. La. Child. Code art. 1037(B); State in the Interest of C.J.K., 00-2375, p. 8 (La.11/28/00), 774 So.2d 107, 113.
Whether termination of parental rights is warranted is a question of fact, and a district court’s factual determinations will not be set aside in the absence of manifest error. State ex rel. K.G., 02-2886 at p. 4, 841 So.2d at 762. In applying the manifest error standard, an appellate court seeks to determine whether the record | ^reflects the district court was clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
In the instant case, OCS sought termination of S.B.’s parental rights under La. Child. Code 1015(5). As correctly noted by the Court of Appeal, this provision sets forth three elements the State must prove by clear and convincing evidence to establish the necessary grounds for termination: (1) a year has elapsed since the child was removed by court order, (2) there has been no substantial parental compliance -with the OCS case plan, and (3) there is no reasonable expectation of significant improvement in the parent’s condition or conduct. La. Child. Code arts. 1015(5) and 1035(A). Once the district court, as in this case, finds all three elements have been proven, the function of the reviewing court is to determine whether the record evidence in its entirety clearly and convincingly satisfied this three-part inquiry.
Because it is undisputed more than one year had elapsed since H.A.B. was removed from S.B.’s custody pursuant to court order, the first element of this inquiry is clearly satisfied in this case. However, the Court of Appeal strongly disputed the District Court’s factual finding regarding the second element and reversed the District Court’s judgment based on its review of the record concerning this issue of substantial compliance. It follows, therefore, this Court’s review must now focus on whether the record evidence shows OCS proved by clear and convincing evidence S.B. has not substantially complied with her OCS case plan, and if so, whether there was no reasonable expectation of significant improvement in S.B.’s condition or conduct, ie., the third element.
We are guided, as were the lower courts, in our substantial compliance inquiry by the provisions of La. Child. Code art. 1036(C). Contrary to the appellate court’s holding, however, our review of the record clearly reveals the uncontradicted expert | astestimony in this case advocated termination because of the persistence of the conditions that led to removal, see La. Child. Code art. 1036(C)(7), as well as the lack of substantial improvement in redressing the problems preventing reunification, see La. Child. Code art. 1036(C)(6), particularly the mother’s and child’s mental health issues coupled with her chil-drearing attitudes.
*369 As detailed above, Dr. Buxton examined H.A.B. and S.B. on several occasions, and as the District Court noted, on each occasion Dr. Buxton found H.A.B. was at a high risk of being subject to abuse and neglect by S.B. because of her mental health and childrearing attitudes and his behavioral tendencies. The need for long-term mental health intervention and counseling for both patients was consistently and redundantly noted in his reports as were his concerns with S.B.’s compliance with treatment recommendations. Also chronicled in his reports was the progression of his recommendations from reunification to termination driven by his history with S.B. and his observations of her behavior and psychoses over a four-year period.
Dr. Dilks also examined both S.B. and H.A.B., and opined S.B.’s history of failing to change her behavior demonstrates an inability on her part to ever actually change that behavior. His psychological testimony, along with Dr. Buxton’s, most importantly reveals the key requirement in all of S.B.’s case plans and treatment recommendations has been continuing psychological counseling.
Although the record does show S.B. completed her treatment with Jennings Behavioral Health, Dr. Dilks’s testimony reveals S.B. is currently not in counseling, she is not in A.A. or N.A., and she does not have a sponsor. As Dr. Dilks opined, given her polysubstance abuse issues and her mental health issues as well as her chil-drearing attitudes, the lack of aggressive participation on her part in her full mental health treatment unfortunately defeats her efforts to successfully parent her |S4child, more than likely ensures the persistence of the conditions that led to H.A.B.’s removals, and hinders any substantial improvement in her redressing of the problems preventing reunification.
Even after completing her counseling program with Jennings Behavioral Health and participating in two parenting classes, she still refuses to accept her mental issues and attitudes have anything to do with her son’s behavioral issues, calling such theories “bull.” It is this unchanging mentality and the failure to meaningfully address her childrearing attitudes that will prevent any attempts at a successful and healthy long-term reunification. Interestingly, both doctors recommended reunification in 2006, but strongly advocated against such action in 2009, based on the case history and S.B.’s and H.A.B.’s behavioral patterns when together and apart. Pursuant to the provisions of La. Child. Code art. 1036(C),[27] this evidence more than convincingly establishes S.B.’s lack of compliance as well as her inability to achieve the first and primary goal of her case plan “to recognize and provide [H.A.B.] with a safe, stable, nurturing environment consistent with his needs.”
Additionally, the record does not contain any real, much less a reasonable, expectation of significant improvement in *370 the parent’s condition or conduct in the near future, considering H.A.B.’s age and his need for a safe, stable, and permanent home, because the issues at the core of this extremely and dangerously unstable lasparent-child relationship remain unchanged and unaddressed by S.B. Rather, the entirety of the record evidence overwhelmingly demonstrates this child thrives both psychologically and academically with stability and consistency. Both of these essentials S.B. still had not demonstrated an ability to provide by the time of trial, seeing as most notably (1) she had just moved four months prior into the home of her so-called fiancé with whom she had yet to set a wedding date and whom she had only known for eight months at the time of trial and (2) had no ability to provide for her child except for her Social Security benefits, which she testified were never going to be terminated.
Moreover, the lack of improvement in the parent-child relationship is most clearly evident in H.A.B.’s reversion to his “old” behaviors after interaction with his mother. OCS reports, CASA reports, medical reports, and the testimony of H.A.B.’s psychologists all demonstrate the onset of H.A.B.’s behavioral issues after unsupervised contact with S.B. Dr. Dilks went so far as to opine his behavioral psychosis was most likely environmentally triggered and not of an organic nature. As the District Court noted, the record conclusively demonstrates H.A.B. made great strides in his behavior in state custody, but would resume his aggressive and manipulative behavior toward others after contact with S.B.
It was the lack of improvement in the parent-child relationship as documented by this family’s case history dating back to 2004 that also formed the basis for all the recommendations, both expert and lay, for termination. Even the appellate opinion had to concede reunification was not appropriate at this time in light of this evidence. Furthermore, it was the extremely dangerous lack of stability in this relationship and S.B.’s triggering and exacerbation of H.A.B.’s own behavioral psychoses and issues, |3fiWhich prompted the District Court’s conclusion full termination with no continuing contact was necessary.
Based on our review of the record, we conclude the District Court did not err in finding OCS satisfied its burden of proving a year had elapsed since H.A.B.’s removal, S.B. has not substantially complied with her case plan, and there is no reasonable expectation of improvement in her condition or conduct. Finding all the elements of article 1015(5) have been proven by clear and convincing evidence, we turn now to the issue of whether it was in H.A.B.’s best interest to terminate S.B.’s parental rights.
At the outset, we recognize a strong and loving bond exists between this child and his mother. According to CASA reports, OCS reports, and Mr. Lejeune’s report and testimony, H.A.B. and S.B. both desire reunification. We also acknowledge both desire in the alternative a continued relationship with each other. We further realize the work S.B. has undertaken for the return of her child. It is undisputed S.B. loves her son and is willing to care for him. However, despite S.B.’s noteworthy efforts, we cannot ignore the record evidence that shows clear and convincingly S.B. has repeatedly demonstrated an inability to parent her child in a stable environment even with OCS assistance and that termination is in the best interest of H.A.B. As required by law, it is paramount we place his best interests above his mother’s.
Children have the right to live in a safe, secure environment and to be reared by someone, who is capable of caring for *371 them. Indubitably, children have a need for permanency. As this Court has previously noted, this need has been recognized on both a federal and state level:
[P]ursuant to the Adoption and Safe Families Act of 1997 [PL 105-89 (HR867) ], U.S.C.A. 42 § 601, et seq., states are mandated to establish “permanency plans” for children within the foster care system. The Act provides that such plans must demonstrate, inter alia, that the State |S7make reasonable efforts to “preserve and reunify” the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian.
Additionally, Louisiana Children’s Code article 603(15) provides that permanent placement means the return of the legal custody of a child to his par-entis); placement of the child with adoptive parents pursuant to a final decree of adoption; or placement of the child with a legal guardian. Children’s Code article 1008(11) defines permanent placement as either placement of the child with a legal guardian or placement of the child with adoptive parents, pursuant to a final decree of adoption. Thus, permanent placement does not include leaving children permanently in foster care.
It is clear that the federal government, just as the State of Louisiana, does not intend for children to remain in foster care permanently. In fact, one of the goals of the federal Act is “to address the problems of families whose children have been placed in foster care so that reunification may occur in a safe and stable manner in accordance with the Adoption and Safe Families Act of 1997.” See 42 U.S.C.A. § 629(b)(3).
State in the Interest of J.M., J.P.M., and M.M., 02-2089 at pp. 15-16, 837 So.2d at 1256-57. Although our primary goal is to reunite the family, termination is appropriate to free the child for adoption if reunification is not possible. “Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child.” Id.
We conclude the evidence reveals the District Court correctly found it is in H.A.B.’s best interest to terminate S.B.’s parental rights. Moreover, while no one can dispute the love these two share and their devotion to each other, the record does show by clear and convincing evidence in the form of both psychological and lay testimony full termination is necessary for the best interest of the child. Undisputedly, unsupervised contact with his mother triggers H.A.B.’s behavioral psychoses. Moreover, the record is replete with evidence, including testimony from S.B., that H.A.B.’s behavioral issues resurfaced both at home and school in October of 2008, when S.B. initiated unsupervised contact with her son after church services. |oaAlthough we readily acknowledge H.A.B.’s attachment to and desire for contact with his mother, we must in accordance with the law, place his need for permanency, his safety, and most importantly, his stability, which are all essential for his “sound development,” above all other considerations. Therefore, we find the District Court did not err in permanently and irrevocably terminating S.B.’s parental rights.
CONCLUSION
In conclusion, our careful review of the record in its entirety demonstrates the District Court was not manifestly erroneous in its termination of S.B.’s parental rights pursuant to La. Child. Code art. 1015(5). The record evidence, including *372 both expert and lay testimony, supports OCS proved by clear and convincing evidence all the elements set forth in La. Child. Code art. 1015(5) and termination was in the best interest of the minor child, H.A.B. In light of these findings, we conclude the Court of Appeal erred in its review of the District Court’s judgment. Therefore, we reverse its judgment and reinstate the District Court’s judgment of termination pursuant to La. Child. Code art. 1015(5).
DECREE
For the foregoing reasons, the judgment of the Court of Appeal is hereby reversed, and the District Court’s judgment permanently and irrevocably terminating S.B.’s parental rights pursuant to La. Child. Code art. 1015(5) is hereby reinstated.
REVERSED; DISTRICT COURT JUDGMENT REINSTATED.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. The District Court also cited La. Child. Code art. 1015(4), i.e., abandonment, as a ground for termination. However, as the Court of Appeal correctly noted, the record indicates only the termination of the unknown father's parental rights was based on abandonment. As explained in detail infra, there was no record evidence S.B. abandoned her child, and in actuality, all evidence points strongly to the contrary. Nevertheless, because the provisions of La. Child. Code art. 1015(5) are dispositive in this case, we pretermit discussion of any other grounds for termination.

. After H.A.B.'s birth, OCS was involved with S.B. several times. The first complaint was made in July 2001 regarding S.B.'s capability to care for the children in her custody. H.A.B. was approximately two years and three months of age and a member of the household, but the complaint did not concern his welfare. The second complaint was made in Calcasieu/Cameron Parish on November 5, 2001, for neglect and lack of supervision. All of the school-aged children in S.B.'s care missed an inordinate amount of school, and there were indications S.B. was staggering from over-medicating herself. No children were removed from her custody. The third complaint was again in Calcasieu/Cameron Parish on February 23, 2002, for neglect. The school-aged children were not attending school, and allegations were made S.B. was over-medicating herself. H.A.B. was not removed from S.B.’s care, but the other children were removed. There was no evidence presented H.A.B. was involved in any of these prior complaints. Moreover, although OCS reports indicate the children were those of S.B.’s boyfriend, a Mr. Paul, S.B. testified at the termination hearing the children were her sister’s.

. According to the various medical documents provided by Dr. Charles A. Murphy dated October 14, 2004, S.B. reported H.A.B. was diagnosed with epilepsy at nine months of age. He intermittently had grand mal seizures and typically had a seizure one to two times every two months. He had been on phenobarbital for longstanding periods of time and was bom a month and a half premature.

.Around this time an emergency room physician from Lake Charles Memorial Hospital stated S.B. had been abusing her medication. Monitoring of S.B.'s consumption of medication revealed S.B. obtained a new prescription of 42 Somas on March 1, 2005, and as of March 2, 2005, there were only 32 pills remaining. Her prescribed dosage was three pills per day.

. It was also documented S.B. threatened to sue the hospital "if patient released and harms self or others.”

. H.A.B.'s alcohol use was listed as "mini coolers & eating Jell-0 shots.”

. Notably, when H.A.B.’s foster mother brought him in for his physical exam on March 16, 2005, Dr. Clawson and his staff, including the four nurses he had assembled to conduct the examination, were amazed by H.A.B.’s "much improved behavior.”

. Mr. Morgan also observed S.B. met "a significant number of the criteria for diagnoses of Munchausen by Proxy Syndrome.” After reviewing her case, however, he concluded not enough of the criteria was met to make that diagnosis.

. S.B.’s case plan consisted of the following goals and actions to be taken towards achieving the goals identified:
Goal: S.B. will recognize and provide H.A.B. with a safe, stable, nurturing environment consistent with H.A.B.'s needs. Actions to be taken:
*351 (1) S.B. will attend and participate in some type of outpatient mental health intervention and/or follow all recommendations of the doctor and counselor for herself.
(2) S.B. will continue to attend and participate in Resource Management services which will have S.B. obtain a psychiatric evaluation to determine her diagnosis and assess the need for medication and the importance of medication compliance.
(3) S.B. will need to take her medication as prescribed.
(4) S.B. will submit to an assessment by a counselor to determine her needs. This might possibly be a group setting, individual counseling, which would address her and H.A.B.’s needs.
(5) Through Resource Management S.B. needs individual therapy for S.B. to address her own history of childhood abuse, past rape, substance abuse and bi-polar disorder.
(6) S.B. should be able to demonstrate she has accepted responsibility for the neglect and the medication abuse of H.A.B. Therapy should address appropriate parenting roles, boundaries, inappropriate overnight houseguests, and consistent, appropriate discipline.
(7) S.B. will need to contact her family physician to discuss her general health and her physical well-being.
(8) The worker will receive the recommendations of the counselor, and she will discuss the recommendations with S.B. The case plan will be amended in order to include the recommendations as a new case plan goal.
Goal: S.B. needs to learn how to set appropriate boundaries and how to discipline H.A.B.

Actions to be taken:

(1) S.B. will attend and participate in some parenting classes and problem solving sessions that will help her learn some parenting skills to help her deal with H.A.B.’s inappropriate behavior problems.
(2) S.B. will put into practice what she has been taught through these parenting sessions to help her be a more effective parent. She will be able to discuss and demonstrate the parenting skills learned in these classes at the visits with H.A.B.
(3) S.B. will sign release of information forms in order that the worker be able to provide the counselor with a social history of the family and that the therapist is able to send reports to the worker on S.B.’s progress.
Goal: S.B. will address her past and present substance abuse issues in efforts to understand how her actions have affected the life of her child.

Actions to be taken:

(1) S.B. will be assessed at the local substance abuse clinic to determine which method of treatment is best for her.
(2) The worker will do a referral for S.B. to be assessed by the Jeff Davis Addictive Disorder Clinic.
(3) S.B. will attend and participate in the substance abuse program on a regular basis until it is felt by the counselor that she no longer needs their services.
(4) After discharge from Jeff Davis Chemical Health, S.B. will remain drug and alcohol free.
(5) S.B. will do random drug screening if recommended.
(6) S.B. will follow all recommendation by Jeff Davis Addictive Disorder Clinic.
(7) S.B. will sign release of information forms in order that the worker is able to provide the counselor with a social history of the family and that the therapist is able to send reports to the worker on her progress.
Goal: S.B. will meet H.A.B.’s needs.

Actions to be taken:

(1) S.B. needs to follow through with the recommendations of Lake Charles Mental Health regarding the care of H.A.B.
(2) S.B. will need to be involved with the services being offered for H.A.B.’s care. She needs to become involved in learning to be responsible for H.A.B.’s care so that when returned to her H.A.B. will remain healthy.
(3) S.B. will work with the agency, kid med, home health, etc. who will be going into the home if and when H.A.B. is returned home.
Goal: S.B. will maintain housing that is clean and safe for the child.

Actions to be taken:

(1) S.B. will obtain and maintain a safe, clean and stable environment in which to reside on a daily basis. S.B. should maintain the same residence for at least six months consecutively.
Goal: S.B. will keep the agency informed of her whereabouts. OCS personnel will assess progress through reports and observations and do referrals for further counseling, parenting, etc. as recommended/needed.
Goal: S.B. will have a loving, nurturing, care-giving, mother/child relationship with her child.

*352
Actions to be taken:

(1) S.B. will visit the child in accordance with the visitation contract.
(2) The case manager will observe some of the visits to assess the parent/child relationship.

.Dr. Dilks also evaluated H.A.B. that same day and noted:
[H.A.BJ’s presentation today suggests he meets criteria for Bipolar Disorder, by history, and ADHD, by history. Features of these disturbances were not apparent and intervention along with medication management has probably gone a long way in controlling symptomatology.... In regards to reunification with his mother, the client expresses a great deal of enthusiasm and excitement. He believes his mother has overcome many of her drug problems and is optimistic about their future together.

. Notably, the vehicle was obtained by S.B. through the assistance of OCS.

. S.B. was arrested on these charges and was not released from state custody until February 2008. The family’s case worker had concerns regarding S.B.'s use of medication, which concerns increased with reports S.B. only requested her pain medication while in state custody.

. On December 14, 2007, H.A.B.’s foster care worker went into S.B.’s home with the Welsh Police Department to retrieve some of H.A.B.'s clothes and personal effects. She found the home below agency standards. There were dog feces and urine throughout the kitchen and living room, there were dirty dishes in the sink, and H.A.B.’s room was so full of various items one could not walk into it.

. This was particularly significant because when H.A.B. was placed in custody this time, he was no longer attending school due to his disruptive behavior and the school’s refusal to allow him in the classroom. In fact, OCS had a difficult time convincing his principal to allow him into a classroom because of his aggressive behavior and previous lack of compliance in school.

. OCS reports and H.A.B.’s psychological evaluations repeatedly documented H.A.B. took on the “persona of an adult, unfortunately, a dysfunctional adult” while in the presence of his mother.

. During his stay in Parker House, H.A.B. was under the following daily medication regiment:
Zyprexa 10 mg
Lexapro 10 mg
Phenobarbital 20 mg (2 times daily)
Metadate CD 20 mg
Clonidine HCL 0.1 mg

.S.B.’s case plan consisted of the following goals and actions to be taken to achieve the identified goals:
Goal 1: S.B. will recognize and provide H.A.B. with a safe, stable, nurturing environment consistent with his needs.

Actions to be taken:

A. S.B. will submit to a psychological assessment by Dr. Buxton to determine her needs.
B. The worker will receive the recommendations of Dr. Buxton and she will discuss the recommendations with S.B. The case plan will be amended in order to include the recommendations as a new case plan goal.
C. S.B. will attend approved anger management therapy/classes. S.B. will be responsible for all fees incurred.
D. S.B. will maintain a safe, clean and stable environment in which to reside on a daily basis. S.B. should maintain the same residence for at least six months consecutively.
E. S.B. will cease her chaotic/histrionic life style. S.B. will not allow harmful, dangerous, deranged, drug dealer/users, chaos seeking individuals in her life.
*354 Goal 2: S.B. will learn how to set appropriate boundaries and how to appropriately discipline H.A.B.

Actions to be taken:

A. S.B. will address her parenting issues by attending an approved parenting class. S.B. will be responsible for all fees incurred. The worker will receive monthly reports from the approved parenting class and will discuss the progress or concerns with S.B.
B. S.B. will be able to demonstrate what she has learned on a daily basis. She must be able to provide appropriate and consistent discipline.
Goal 3: S.B. will address her past and present drug usage.

Actions to be taken:

A. S.B. will submit to a drug assessment by an approved counselor. S.B. will be responsible for all fees incurred. The case plan will be amended in order to include the recommendations as a new case plan goal.
B. S.B. will provide the agency with a valid prescription for all medications.
C. S.B. will do random drug screening if recommended.
Goal 4: S.B. will contribute to her child’s care.

Actions to be taken:

A. Once assessed S.B. will present a money order every month.
B. S.B. will provide the worker with verification of money sent by providing a copy of the money order.
Goal 5: S.B. will cooperate with the agency in order to have her child returned to her care.

Actions to be taken:

A. The case worker will visit with S.B. twice a month to discuss the case plan and progress on the case plan.
B. S.B. will be available for contacts with the caseworker to discuss the case plan and the child's current situation.
C. S.B. will contact her worker once a week to check in. If the worker is unavailable she will leave her contact information.
D. S.B. will attend any and all court hearings and abide by any court orders.
E. S.B. will follow the visitation contract.
F. S.B. will be supportive of the child’s placement and work positively with the caretaker.
G. S.B. will sign any and all needed forms of releases.

. The bruises from this punishment were clearly evident on H.A.B.’s buttocks and documented by S.B. through photographic evidence.

. OCS also sought termination on the basis *356 of La. Child. Code art. 1015(3)(parental misconduct) and (4)(abandonment), but as explained in note 1, supra, these provisions are not relevant to the disposition of this case and, so, will not be addressed herein.

. Around the time of this admission, S.B. revoked her release of information form in favor of OCS. Therefore, OCS did not learn of this admission until some time later and did not have access to S.B.’s records concerning this admission.

. The District Court explained:
The Court has listened to the testimony. The first issue, which is really not before the Court at this time, was the valid complaints of Mr. Botley, the foster parent, in regard to the minor child. The Court is going to state for the record that the State is supervising that. Again, the-it’s the Court's position that for the best interest of the child that the child be placed with the State. The Court has been satisfied that the State is aware of the allegations and that they’re doing the review. If that does not take place, then it could come back to me.

. According to testimony, Mr. Breaux is in his seventies, he is gainfully employed in the construction field, and his forty-three-year-old daughter also resides with him to help S.B. with the housework and the rearing of his great-grandchildren.

. Notably, as evident in the June 16, 2009 OCS case plan review report, S.B.’s case plan had been modified to address the closure of Jennings Behavioral Health: “[S.B.] must seek out treatment from a mental health fácility to ensure her mental stability. Mental stability ensures a better quality of interaction with her child.”

. An ad hoc curator was appointed to represent the interests of H.A.B.’s unknown father, The District Court determined it was in H.A.B.'s best interest his unknown father’s parental rights also be terminated. However, the unknown father did not appeal this ruling, and therefore, that issue is not before this Court.

. After rendition of this judgment, OCS filed its August 27, 2009 report, which explained: “Because of a valid investigation on the Bot-ley foster home where [H.A.B.] was placed, State Office closed the home. [H.A.B.] was then placed in the home of Mr. and Dr. La-comb. [H.A.B.] is doing well in this placement.”

. Judge Amy dissented from the majority’s opinion and found the evidence supported the District Court's decision to terminate S.B.’s parental rights. Judge Amy stated, in pertinent part:
The trial court heard testimony from several witnesses who opined that H.A.B. should not be returned to his mother. Dr. Alfred E. Buxton opined that because the State could not realistically provide the type of intensive services that S.B. would need in order to provide H.B. with a stable environment, H.B. should not be returned to his mother. Dr. Lawrence S. Dilks agreed that H.B. should not be returned to his mother, reasoning that S.B.'s history of failing to change her behavior after being afforded opportunities, demonstrates an inability on her part to ever actually change that behavior.
Louisiana Children’s Code Article 1036(C) provides several factors which can evidence a parent’s lack of compliance with a case plan under La.Ch.Code art. 1015(5). My review of the record, especially review of the expert testimony, reveals that S.B.’s lack of compliance with the case plan is evidenced by "lack of substantial improvement redressing the problems preventing reunification” and "persistence of conditions that led to removal or similar potentially harmful conditions.” La.Ch.Code art. 1036(C)(6) and (7).
The majority finds that [the] trial court erred in finding grounds for termination, but notes that reunification may not appropriate at this time. Admittedly, the State’s *366 primary goal in the child in need of care process is reunification; however, if reunification is not [be] possible, termination is appropriate. State ex rel. J.M., 02-2089 (La.1/28/03), 837 So.2d 1247. "Certainly, children have a need for permanency. Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child.” Id. at 1257.
The record indicates that S.B. has a history of State intervention involving the rearing of H.B. since 2005. Further, the expert testimony supports that S.B. will be unable to care for the child unless there is indefinite State intervention and monitoring. Accordingly, I find that the record supports the trial court’s determination that termination of S.B.'s parental rights is appropriate.

. Notably, as for La. Child. Code art. 1036(C)(1), although S.B. did attend all court-approved scheduled visitations with H.A.B., she knowingly violated the visitation contract on numerous occasions to the psychological detriment of her child. Moreover, the August 27, 2009 report filed by OCS revealed S.B. was twenty-five minutes late for her August visit with H.A.B., and during the July visit, S.B. "became very upset and fled the office slamming the door, peeling out of the parking lot, and pulling out in front of another vehicle. All this behavior was displayed in front of [H.A.B.]. [H.A.B.] was yelling at his mom 'Slow down you’re going to kill yourself.'" As for La. Child. Code art. 1036(C)(3), sometime during her stay in the hospital in November of 2008, S.B. revoked her release of information, which was required by all her case plans. OCS learned of the hospitalization from another source, but was still unable to access the records of her hospitalization.