GUIDRY, J.
A.S. appeals from a trial court judgment terminating her parental rights to E.O. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
A.S. is the mother of E.O., who was born on June 8, 2016. On July 15, 2016, the Department of Children and Family Services (DCFS) received a report of alleged neglect concerning E.O. The report stated that the five week old E.O. was being admitted to the hospital for a skull fracture *554 and that the parents' explanation of the infant falling off of an air mattress and hitting his head on the hard wood floor was not consistent with the injury. A.S. also presented at the hospital with an abrasion and swelling over her left eye as a result of E.O.'s father, C.O., striking her before the incident with E.O.
Upon investigation, DCFS spoke with A.S. and determined that A.S. woke up at 3:00 a.m. to feed E.O., who started crying, and C.O. became angry. An argument ensued between A.S. and C.O., whereupon C.O. struck A.S. in the head. C.O. left the home, returning a while later. A.S. then left E.O. in C.O.'s care while she took a nap. Thereafter, A.S. heard a thump and then heard E.O. crying. C.O. explained that E.O. fell off of the air mattress. A.S. admitted to a lengthy history of domestic violence between herself and C.O., and that this had occurred in the presence of E.O.
DCFS sought an instanter order, which was orally granted by the trial court, removing E.O. from the custody of A.S. and placing him in the temporary custody of DCFS. Following a continued custody hearing, the trial court continued custody of E.O. with the State, placing E.O. in the custody of foster parents.[1]
On August 10, 2016, DCFS filed a child in need of care petition, alleging lack of supervision by A.S. and C.O. A hearing was held on September 20, 2016, where A.S. stipulated that E.O. was in need of care without admitting the allegations of the petition. C.O. was not present at the hearing. The trial court ordered that E.O. be returned to A.S.'s care and that a protective order be maintained and a safety plan put into place. The trial court further ordered that a family services case be opened and that DCFS assist with counseling for A.S. Thereafter, a case plan with the goal of reunification was approved by the trial court on October 18, 2016.
Thereafter, on December 12, 2016, DCFS received another report of neglect/lack of adequate supervision and neglect/medical neglect concerning E.O. DCFS received a report that A.S. and C.O. were in a domestic altercation in the middle of the road on December 7 or December 8, 2016, while E.O. was in the car, and C.O. damaged the car so that it had to be towed. On December 9, 2016, A.S. was in a car accident with E.O. and removed him from the scene and refused to obtain medical care for him. It was also reported that E.O. had a cold that progressed to Respiratory Syncytial Virus (RSV), and A.S. had refused to take him to the doctor.
DCFS made contact with A.S. and E.O. on December 12, 2016, at Pediatric Associates of Denham Springs, where A.S. disclosed that she had been in an accident but that she did not take E.O. to the doctor because she did not believe he needed medical attention. She further denied having had any contact with C.O. Upon speaking with medical professionals, DCFS learned that E.O.'s birth weight had decreased tremendously, dropping from the thirty-eighth percentile to the eighth percentile, which is considered failure to thrive. Accordingly, DCFS applied for and received an oral instanter order on that date, placing E.O. in the temporary custody of DCFS.
On January 17, 2017, DCFS filed a motion to modify disposition, stating that after issuance of the verbal instanter order, DCFS notified A.S. of the order and A.S. became very hostile and refused to *555 turn over E.O. Nurses at the doctor's office tried to get E.O. from A.S., but A.S. refused and spit on the DCFS worker and called her names. While waiting for law enforcement to arrive, A.S. twice tried to run out of the door with E.O. On her second attempt, the DCFS worker ran after her and A.S. swung and hit the worker in the head. Law enforcement ultimately intervened and removed E.O. from A.S., and A.S. was arrested for simple battery of a child welfare worker, disturbing the peace, simple assault, and obstruction of a court order. E.O. remained in the custody of DCFS and was placed with foster parents.
A case plan was filed into the record on January 17, 2017, noting that A.S. continues to place the child in danger by violating the protective order and failing to seek medical attention for the child when needed. The case plan directed that A.S. is to maintain housing that is physically safe and meets the child's basic needs; contribute payments toward the cost of her child's care while in foster care in the amount of $ 100/month; undergo a substance abuse and mental health assessment; obtain and maintain income; undergo random drug screens; complete anger management and demonstrate an ability to control her emotions and handle conflict in an alternative manner; and complete parenting education.
Thereafter, DCFS filed a motion for consent of medical treatment, because E.O. was in need of a bilateral tube placement and frenulectomy to correct tongue tie and improve feeding problems and speech development, and A.S. had denied her consent to the procedures. The trial court issued an order approving the request on February 21, 2017.
In a May 16, 2017 case plan, it was noted that A.S. had failed to comply with the requirements of her plan. Furthermore, while A.S. stated that she had completed a mental health assessment, attended counseling, and obtained employment at Waffle House, she did not provide any documents verifying her assertions. The goal listed in the case plan was still reunification. Thereafter, DCFS filed a motion to appoint CASA, which was granted.
On November 11, 2017, DCFS completed another case plan, again noting that A.S. had failed to make her parental contributions; refused her consent for medical treatment for E.O and was fifty-two minutes late on the date of E.O.'s surgery; had attended four therapy appointments but missed four appointments and had not been to any appointments within the last five months; had an anger management assessment, missed her next four appointments, but had attended appointments in the last few weeks; was homeless and living in her car; and was currently unemployed. The case plan also noted that A.S. was in a relationship with B.M., who has a criminal history, is on probation, and has been reported to DCFS as being violent toward and controlling of A.S. DCFS indicated that it would be asking for a change in the goal from reunification to adoption. Following a permanency review hearing on November 30, 2017, the trial court approved the goal change from reunification to adoption.
Thereafter, on February 1, 2018, DCFS filed a certification for adoption and petition for termination of parental rights, citing as its basis: (1) E.O. was returned to state's custody during a period of supervision by DCFS; (2) abandonment for failing to provide significant contributions to the child's care and support from 12/12/16 to date and failing to pay child support; and (3) no substantial parental compliance with the case plan and no reasonable expectation of significant improvement in parents' condition or conduct in the near future.
*556 Following a hearing, the trial court signed a judgment ordering that A.S.'s parental rights be terminated under La. Ch. C. arts. 1015(4)(j), 1015(5) and 1015(6) and that C.O.'s parental rights be terminated under La. Ch. C. art. 1015(5) and 1015(6). The judgment further ordered that it is in the best interest of E.O. that the parents' rights be terminated and declared that E.O. is free and eligible for adoption.
A.S. now appeals from the trial court's judgment.
DISCUSSION
Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. Louisiana Children's Code article 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. In order to terminate a person's parental rights, the court must find the State has established at least one of the statutory grounds contained in Article 1015 by clear and convincing evidence. See La. Ch. C. art. 1035(A). Notwithstanding, even upon finding the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines to do so is in the child's best interest. La. Ch. C. art. 1037(B). Whether termination of parental rights is warranted is a question of fact, and a trial court's factual determinations will not be set aside in the absence of manifest error. State ex re. H.A.B., 10-1111, p. 31 (La. 10/19/10), 49 So.3d 345, 368.
In the instant case, the trial court terminated A.S.'s parental rights under La. Ch. C. arts. 1015(4)(j), 1015(5) and 1015(6). On appeal, A.S. contends that the trial court erred in finding that DCFS proved any of these legal grounds for termination of her parental rights by clear and convincing evidence.
Louisiana Children's Code article 1015(4)(j) provides:
(4) Misconduct of the parent toward this child or any other child of the parent or any other child which constitutes extreme abuse, cruel and inhumane treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
* * *
(j) Abuse or neglect after the child is returned to the parent's care and custody while under department supervision, when the child had previously been removed for his safety from the parent pursuant to a disposition judgment in a child in need of care proceeding.
At the termination hearing, DCFS presented evidence that E.O. first came into its care on July 15, 2016, after it was determined that E.O. had received a skull fracture that was inconsistent with the explanation provided by A.S., and that A.S. had been involved in a domestic dispute with E.O.'s father, C.O., prior to E.O.'s injury. A.S. subsequently stipulated that E.O. was a child in need of care. After obtaining a protective order against C.O., the trial court ordered that E.O. be returned to A.S.'s care under the continued supervision of DCFS, and the matter was set for further review on January 24, 2017. However, on December 12, 2016, E.O. was again removed from A.S.'s care by DCFS after receiving a report of neglect/medical neglect and determining that E.O.'s birth weight had decreased from the thirty-eighth percentile to the eighth percentile while in the care of A.S. A.S. did not offer any evidence to contradict that offered by DCFS.
*557 Accordingly, from our review of the record, we find no manifest error in the trial court's finding that DCFS proved this ground for termination of A.S.'s parental rights by clear and convincing evidence.
We also find no manifest error in the trial court's finding that DCFS proved by clear and convincing evidence that A.S.'s parental rights should be terminated under La. Ch. C. art. 1015(5). Louisiana Children's Code article 1015(5) provides:
(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
According to the record, at the time DCFS filed its certification for adoption and petition for termination of parental rights on February 1, 2018, A.S. had not paid child support nor had she provided significant contributions to E.O.'s care and support since E.O. was removed from her care on December 12, 2016, a period of over a year. This fact is not contested by A.S. Furthermore, while A.S. made a payment of a portion of the amount of support/parental contributions that she owed to DCFS immediately prior to the trial of this matter, such payment does not defeat the application of La. Ch. C. art. 1015(5). See La. Ch. C. art. 1015(5) (noting that period for abandonment is as of time the petition for termination is filed); see also In re MDA, 427 So.2d 1334, 1336 (La. App. 2 Cir. 1983).
Furthermore, we find no manifest error in the trial court's finding that DCFS proved by clear and convincing evidence that A.S.'s parental rights should be terminated under La. Ch. C. art. 1015(6). Louisiana Children's Code article 1015(6) provides:
(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
Louisiana Children's Code article 1036, which addresses proof of parental misconduct, provides in pertinent part:
C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting *558 the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.
(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.
D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
DCFS presented documentary evidence and testimony at the trial in support of its petition to terminate the parental rights of A.S. under La. Ch. C. art. 1015(6). According to the case plan filed into the record, DCFS required A.S. to: (1) maintain housing that is physically safe and meets the child's basic needs; (2) contribute payments toward the cost of her child's care while in foster care in the amount of $ 100.00/month; (3) undergo a substance abuse and mental health assessment; (4) obtain and maintain income; (5) undergo random drug screens; (6) complete anger management and demonstrate an ability to control her emotions and handle conflict in an alternative manner; and (7) complete parenting education.
Subsequent case plans were offered into evidence at trial detailing A.S.'s failure to comply with her case plan. A May 16, 2017 case plan noted that A.S. had failed to comply with the requirements of her plan, and while A.S. stated that she had completed a mental health assessment, attended counseling, and obtained employment at Waffle House, she did not provide any documents verifying her assertions. Additionally, a November 11, 2017 case plan again noted that A.S. had failed to make her parental contributions; refused her consent for medical treatment for E.O and was fifty-two minutes late on the date of E.O.'s surgery; had attended four therapy appointments, missed four appointments, and had not been to any appointments within the last five months; had an anger management assessment, missed her next four appointments, but had attended appointments in the last few weeks;
*559 was homeless and living in her car; and was currently unemployed. The case plan also noted that A.S. was in a relationship with B.M., who has a criminal history, is on probation, and has been reported to DCFS as being violent toward and controlling of A.S.
Additionally, Marla Wright, the DCFS foster care worker assigned to the matter, testified as to A.S.'s compliance with the case plan. According to Wright, A.S. completed parenting education in February 2017. Furthermore, Wright stated that while A.S. did not have a drug screen or substance abuse assessment for the first twelve months of her case, A.S. finally had a substance abuse assessment in December 2017, and has been going to classes since that date and has not tested positive for drugs since that time.
However, as to the other parts of her case plan, Wright stated that despite A.S.'s notification at a permanency hearing in November 2017 that DCFS was changing the goal from reunification to adoption, A.S. failed to demonstrate any progress in complying with her case plan until February 2018 after the petition for termination was filed. According to Wright, A.S. has undergone a mental health assessment and attended eleven appointments, seven of which have been since February 2018. Furthermore, Wright stated that A.S. has failed to pay any parental contribution toward the care of E.O. since E.O. was removed from her care in December 2016, but acknowledged that A.S. presented DCFS with a $ 400.00 money order in March 2018 at the pre-trial conference.
Wright stated that with regard to housing, A.S. has failed to maintain stable housing for the entirety of the case. After E.O. was removed from her care in December 2016, A.S. lived with her father who DCFS had determined was unsuitable due to his criminal history and alcoholism. Wright stated that A.S. informed her in July 2017 that she was living in a trailer, and upon inspection of the trailer, Wright discovered that A.S. was borrowing electricity from her neighbor by the use of extension cords and had a tent set up inside the trailer over a bed. Wright further stated that A.S. informed her in September 2017 that she was homeless; in October 2017 that she was given a camper, but did not provide any further information or address; in November 2017 that she was living in her vehicle; and in February 2018 that she was living with her father. Throughout this period of time, Wright stated that she offered assistance to A.S. in finding suitable housing, including offering to assist her in completing an application for low-income housing through the federal government, but that A.S. never provided her with the employment verification necessary to complete the application. It was not until April 23, 2018, one day prior to the trial of this matter, that A.S. informed Wright that she had been living in a two bedroom trailer in Walker, Louisiana for about one week, which Wright visited and found to be suitable.
Wright further stated that with regard to employment, A.S.'s income has been sporadic. Between March and May 2017, A.S. provided five or six weeks of paycheck stubs from employment at Waffle House. However, Wright did not receive another paycheck stub from A.S. until March 2018, which was for payment of $ 61.00 from the Salad Station. Wright stated that on the day prior to trial, A.S. provided her with a paycheck stub from Waffle House, indicating that she had started working there on April 16, 2018. According to Wright, there is no consistency in A.S.'s income so as to demonstrate that she will be able to provide for E.O.
With regard to anger management, Wright stated that A.S. had completed anger *560 management courses but has not demonstrated an improvement in her ability to manage her temper. Wright stated that during her visitation with E.O. in March 2018, A.S. was told to go inside for the visitation because it was cold and E.O. was not dressed appropriately for the cold weather, and A.S. became angry, flung open the door to the building, yelled at the foster parents, made demeaning comments to the foster father, and yelled as she went into the visiting room. Wright stated that she warned A.S. that if her behavior continued, DCFS would end the visit, and despite this warning, A.S. continued her behavior and DCFS ended the visit.
Finally, Wright noted that A.S. had likewise not changed her behavior with regard to abusive and dangerous relationships. Wright stated that despite A.S.'s completion of a domestic violence program, A.S. admitted in February 2018 that she was in a relationship with B.M., who often accompanied her during the visitations with E.O., and that B.M. was a methamphetamine user and convicted felon, had given her stolen items for which she did not file a report with the police, and been involved in an altercation with her on February 21, 2018.
From our review of the entire record, we cannot say that the trial court was manifestly erroneous in finding that A.S.'s parental rights should be terminated under La. Ch. C. art. 1015(6). As noted by Wright, while A.S. may have taken steps in the right direction at the very end, she had the opportunity throughout the duration of her case to show that she was willing and able to care for E.O. and failed to do so. Furthermore, the evidence clearly indicates that A.S. has failed to show a change in her behavior.[2]
In addition, we find no error in the trial court's determination that termination of A.S.'s parental rights is in the best interest of E.O. As noted above, A.S. has demonstrated an inability to comply with her case plan and continues to demonstrate an inability to make good, safe choices for herself and her child. At the time of trial, E.O. was twenty-two months old and had lived with his foster parents for eighteen of those months. According to Wright, E.O. has bonded with his foster parents and is happy and progressing well. Wright stated that the foster parents have taken good care of E.O. and treat him like he was their own. Therefore, considering the evidence in the record demonstrating grounds for termination and that termination of A.S.'s parental rights is in the best interest of E.O., we find no error in the trial court's judgment terminating A.S.'s parental rights and finding E.O. is free and eligible for adoption.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to A.S.
AFFIRMED.

The trial court initially placed E.O. with his maternal grandparents. However, E.O. was removed and placed with foster parents when DCFS learned that the maternal grandparents were not suitable.

We note that A.S.'s behavior at trial further evidenced that her behavior has not changed. During the testimony of the DCFS worker regarding the events that occurred on December 12, 2016 when E.O. was removed from the care of A.S., including the violent behavior exhibited by A.S., A.S. began laughing, which was specifically pointed out by the trial court on the record.