STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2020 CJ 0782

STATE OF LOUISIANA
IN THE INTEREST OF J.L. AND E.L.

**Judgment Rendered:** DEC 3 0 2020

\* \* \* \* \* \*

On appeal from the
Denham Springs City Court
In and for the Parish of Livingston
State of Louisiana
Docket Number 12002

Honorable Jerry L. Denton Jr., Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Laura Slocum<br>Livingston, LA | Counsel for Plaintiff/Appellee<br>Department of Children and Family<br>Services |
| Brad Cascio<br>Livingston, LA | Counsel for Plaintiff/Appellee<br>State of Louisiana |
| Alice Montestruc<br>Baton Rouge, LA | Council for Plaintiff/Appellee<br>J.L. and E.L. minor children |
| Rodney Erdey<br>Denham Springs, LA | Counsel for Defendants/Appellants<br>Parents of J.L. and E.L. |

\* \* \* \* \* \*

BEFORE: GUIDRY, McCLENDON, AND LANIER, JJ.

**GUIDRY, J.**

The mother and father of two minor children appeal from a trial court judgment, which terminated their parental rights and freed their children for adoption. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

J.C.L., who was born on March 10, 2016, and E.W.L., who was born on June 2, 2017, are the children of N.B. (mother) and J.L. (father). On September 25, 2017, the Department of Children and Family Services (DCFS) received a report of alleged neglect concerning E.W.L. Thereafter, DCFS obtained an oral instanter order removing J.C.L and E.W.L. from the custody of their mother and father, placing them in the custody of DCFS. According to the affidavit filed in support of the instanter order, DCFS alleged that N.B. had not followed through on required services for the newborn's, E.W.L.'s, severe head and neck deformities. DCFS further alleged that E.W.L.'s skin was breaking down due to lack of cleaning and that on September 29, 2017, the DCFS worker found the family in a hotel room overwhelmed by stench, and that DCFS had good cause to believe the children could not be protected if they remained in their present situation. The oral instanter order was followed by a written order signed on October 2, 2107. Thereafter, the children were continued in the custody of the state.

On October 24, 2017, the state filed a child in need of care petition alleging that the parents were dependent and had failed to provide adequate supervision and shelter. Following, at the November 9, 2017 answer hearing, both parents stipulated that the children were in need of care without admitting to the allegations of the petition.[1] Thereafter, DCFS developed, and the court approved, an initial case plan wherein the goal for the children was stated as reunification

---

[1] The disposition hearing was held on December 7, 2017.

2

with the parents. However, approximately one and one-half years later, the goal was changed to adoption, with approval of the court.

On May 28, 2019, DCFS filed a petition to terminate the parental rights of N.B. and J.L. as to the children J.C.L. and E.W.L. DCFS alleged that there was no substantial compliance with the case plan, no reasonable expectation for significant improvement in the parents' condition, and no substantial change in behavior. A trial was held on August 22, 2019. The court reconvened on September 12, 2019, issuing a ruling to terminate the parental rights of N.B. and J.L pursuant to La. Ch.C. art. 1015(6). The judgment, which was signed on September 12, 2019, also stated that it was in the best interest of the children that the parents' rights be terminated and the children declared free and eligible for adoption. That judgment is now being appealed by N.B. and J.L. The parents essentially claim the trial court erred in finding that the grounds for the termination of their parental rights were met. They also contend that the trial court erred in maintaining the child in need of care petition.[2]

## DISCUSSION

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. The grounds for termination of parental rights, as applicable to this matter, are found in La. Ch.C. art. 1015(6) as follows:

> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or

---

[2] In this appeal, N.B. and J.L. seem to challenge the child in need of care petition. However, the trial court signed the child in need of care adjudication judgment on November 9, 2017, and that judgment contains a stipulation of the parents, through their respective attorneys, that the children were in need of care. Accordingly, we note that the adjudication judgment is a consent judgment from which an appeal may not be taken. See La. C.C.P. art. 2085. Neither was the child in need of care adjudication judgment timely appealed. See La. Ch.C. art. 332.

3

conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

In order to terminate parental rights, the petitioner must prove each element of a ground for termination of parental rights by clear and convincing evidence. See La. Ch.C. art. 1035(A). In addition, La. Ch.C. art. 1037(B) provides, in pertinent part:

> When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.

Whether termination of parental rights is warranted is a question of fact, and a trial court's determinations will not be set aside in the absence of manifest error. State ex rel. H.A.B., 10-1111, p. 31 (La. 10/19/10), 49 So. 3d 345, 368. Regarding the failure to comply with a case plan, La. Ch.C. art. 1036 provides, in relevant part:

> C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) *The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.*
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) *The parent's lack of substantial improvement in redressing the problems preventing reunification.*

4

(7) *The persistence of conditions that led to removal or similar potentially harmful conditions.*

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) *Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.*

(Emphasis added.)

In the matter before us, we find no manifest error in the trial court's finding that DCFS proved by clear and convincing evidence that N.B.'s and J.L.'s parental rights should be terminated under La. Ch. C. art 1015(6). At trial, DCFS presented documentary evidence and testimony in support of its petition to terminate parental rights. According to the case plans filed into the record, DCFS required N.B. and J.L. to, among others: maintain housing adequate to meet the children's basic needs; contribute payments toward the cost of the children's care while in foster care in the amount of $100.00/month; and work towards achieving permanency before or within 12 months of the children's placement in foster care. The case plan dated February 25, 2019, changed the permanency goal from reunification to

adoption due to insufficient behavior change.[3] As evidenced by testimony at trial, issues remained with the parents' parental contributions, housing, employment, and more.

Regarding the parents' ability to provide for the children, J.L. admittedly did not pay parental contributions in the amount of $100/month during the period of October 2017 to August 2018. However, from the dates of February 2018 to July 2019, payments were made totaling $400.00, which DCFS found to be insignificant contributions.[4] Regarding employment, N.B. and J.L. did not provide to DCFS documentation, as required, evidencing their financial income on a monthly basis. J.L. provided no proof of income from September 2017 to December 2018. DCFS then received a handwritten letter from J.L.'s landlord stating that J.L. worked for him and earned $150/week. Thereafter, J.L.'s legal counsel provided two pay stubs from J.L.'s employer, Circle K.

In terms of housing, the testimony of DCFS was that it was never provided with a lease agreement. According to the agency, although the parents have maintained housing since 2018, their housing situation remains tenuous based upon the lack of a lease agreement, which could result in eviction at any time.

As it concerns parenting behavior, the DCFS worker noted that while N.B. had successfully completed parenting services, she had failed to demonstrate what she had learned: "Although [N.B.] participated in services and received a certificate there's still been concerns, we've still had to have numerous occasions where we are redirecting having the same conversations over and over about child proofing, about safety, about different types of parenting techniques and about nutrition." As it concerns both parents, the DCFS worker explained "it's about

---

[3] The change in the permanency goal was approved by the court on December 6, 2018.

[4] We note that as of September 2018, N.B. was no longer required to pay the parental contribution, due to disability.

their ability to show that they have taken in the information that has been given to them by service providers and demonstrating their understanding of the importance of it." The worker also stated that lack of behavior change is evidenced by "the totality of looking at this case over time." With regard to anger management, while the DCFS worker stated that N.B. had completed her anger management course, she expressed concerns about two incidents at a doctor's office when N.B. became irate and disruptive, having to be relocated during one incident.

Furthermore, DCFS testified that N.B.'s and J.L.'s lack of behavior change and inability to improve is evidenced by a prior history with older siblings coming into care on substantially similar circumstances where a failure to change behavior resulted in N.B.'s termination of parental rights as to those children. While J.L. was not the biological father of the aforementioned children, he was nonetheless involved in the household and was a support system to N.B. during that time.

When asked why termination of parental rights is in the best interest of the children, the DCFS worker stated:

> [A]lthough the parents have made efforts to complete the services in their case plan the agency has continued concerns and reservations about their ability to provide appropriate care for these children. ... [A]s we stated earlier the parents have had repeated history with the agency for neglect going on 5 years now and the services implemented both during the last case and the current case do not seem to have resolved any of these issues substantially. There's been some improvement but not what we would need to see when we are looking at the fact that these children have been in custody for two years. Despite the fact that the agency and service providers have made numerous attempts to enlighten the parents to areas of concern they have maintained the mindset that basically that they did not do anything wrong, their children were unfairly taken from them, they don't see a problem in the, and this is what they've verbalized to us is they don't see a problem with the way that they cared for their children.

Also, during her testimony, the worker stated, "What we are looking at in this case is a pattern of ultimately not just the past two years but five years of these problems going on."

7

Additionally, Brian Murphy, Ph.D., an expert in psychology, testified that N.B.'s mental age calculation was 7 to 10 years of age and that "[t]here's a whole array of things that were evaluated and they were all subpar." Dr. Murphy stated that he had concerns about N.B.'s ability to competently parent her children. Dr. Murphy also testified that he was not surprised to learn that the parents had participated in services, but presented no marked improvement in behavior.[5] Dr. Murphy stated that he had hoped it would go better, but if DCFS told him there was a federal requirement as a protective agency, he would go along with their recommendation.

After a review of the entire record herein, we cannot say the trial court was manifestly erroneous in finding that the parental rights of N.B. and J.L. should be terminated under La. Ch. C. art. 1015(6). Additionally, we find no error in the trial court's determination that the termination of N.B.'s and J.L.'s parental rights is in the best interest of the children. At the time of trial, J.C.L. was three years old, after coming into care at eighteen months; E.W.L. was two years old, after coming into care at three months. Both children had lived with the same foster parent during the duration of their time in care, and that foster parent was willing to adopt.[6] As noted by the DCFS worker, while the parents may have checked boxes, not enough behavior change had occurred given the time, ages, and needs of the children.

## CONCLUSION

For the foregoing reasons, the September 12, 2019 judgment of the trial court is affirmed. All costs of this appeal are assessed to N.B. and J.L.

**AFFIRMED.**

---

[5] Dr. Murphy testified that J.L.'s IQ scores were in the low average range, at the sixteenth percentile. The fiftieth percentile is average.

[6] The children's attorney argued that it was in the children's best interest that they be adopted.

8