STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

DOCKET NUMBER
2023 CJ 1357

STATE OF LOUISIANA IN THE INTEREST OF L.J.

*Judgment Rendered:* DEC 2 6 2024

* * * * *

ON APPEAL FROM THE
TWENTY-SECOND JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF WASHINGTON
STATE OF LOUISIANA
DOCKET NUMBER J-22-05

HONORABLE SCOTT GARDNER, JUDGE PRESIDING

* * * * *

| | |
|---|---|
| Annette Roach<br>Lake Charles, Louisiana | Attorney for Appellant<br>K.J., mother of L.J. |
| John Thomas<br>Franklinton, Louisiana | |
| Kimberly E. DeBrock<br>Covington, Louisiana | Attorney for Appellee<br>State of Louisiana, Department of<br>Children and Family Services |
| Rebecca Henderson<br>Mandeville, Louisiana | Attorney for Appellee<br>L.J. |
| Linda S. Stadler<br>Madisonville, Louisiana | Attorney for Appellee<br>J.J., father of L.J. |
| Chiméne St. Amant<br>David Jeddie Smith, Jr.<br>Assistant Attorneys General<br>Baton Rouge, Louisiana | Attorneys for Attorney General<br>Liz Murrill |

**BEFORE: THERIOT, PENZATO, AND GREENE, JJ.**

Greene, J. dissents with reasons

**THERIOT, J.**

A mother appeals a judgment that terminated her parental rights to her minor child and certified the child as eligible for adoption.[1] After review, we affirm.

## FACTS AND PROCEDURAL HISTORY

K.J. and J.J. are the mother and father of L.J., who was born on August 18, 2022.[2] At the time of L.J.'s birth, the State of Louisiana, Department of Children and Family Services ("DCFS"), had been working with K.J. and J.J. since October 2021 due to their neglect of their three older children ("L.J.'s siblings"), who were placed in DCFS's custody in January 2022.[3] DCFS had related concerns about L.J.'s safety, health, and well-being from the time of his birth and was supervising L.J. while in the family home. On December 1, 2022, L.J. was removed from the custody of K.J. and J.J. and placed in the custody of DCFS pursuant to an instanter order.

According to DCFS caseworker Alexandra Ward, K.J. and J.J. were supposed to be participating in substance abuse treatment, Family Preservation Court ("FPC"), and Louisiana State University Infant Team's ("LSU Infant Team") parenting education program as part of the case with L.J.'s siblings, as well as maintaining a clean, sanitary living environment. DCFS and the LSU Infant Team had been counseled K.J. and J.J. since L.J.'s birth on parenting skills, safe sleeping, keeping a safe and stable home, and making sure L.J.'s needs were being met.

Ward reported that K.J. and J.J. continuously failed to make sure L.J.'s needs were being met and were noncompliant with substance abuse treatment during November 2022. Additionally, Ward explained that the LSU Infant Team had expressed numerous concerns about L.J.'s safety and well-being in the care of his parents.[4] Ward described

---

[1] The same September 22, 2023 judgment terminated the parental rights of the minor child's father; however, the father has not appealed. The judgment is final as it relates to termination of his parental rights. See **State in Interest of A.B.**, 2023-0655 (La. App. 1st Cir. 1/19/24), 383 So.3d 933, 935 n. 2, writ denied, 2024-00221 (La. 3/7/24), 380 So.3d 552.

[2] The initials of the mother, father, and minor child are used to protect the identity of the minor child. See Uniform Rules-Courts of Appeal, Rules 5-1 and 5-2.

[3] DCFS previously intervened for the safety of L.J.'s siblings in 2015 based upon allegations of inadequate shelter, medical neglect, and lack of supervision.

[4] Ward attested to these facts in an "Affidavit in Support of Instanter Order for Removal and Provisional Custody to the Department of Children and Family Services."

K.J. and J.J.'s home as "unkempt" and "in disarray" since L.J.'s birth and stated that she had observed L.J. with urine and feces-soaked diapers on multiple occasions.

Ward also reported that L.J. had a deep, "croupy-type" cough when she visited the home on November 30, 2022. According to Ward, K.J. and L.J. reported that they had no concerns and that they did not plan to schedule an appointment for L.J. to be seen. Per Ward, K.J. expressed that there was already a wellness appointment scheduled to take place on December 21, 2022, and stated that she did not need to bring L.J. to see the doctor any sooner.

On December 5, 2022, a continued custody hearing was held and the trial court ordered L.J. to remain in the provisional custody of DCFS. On or about December 9, 2022,[5] the District Attorney of the 22nd Judicial District Court, State of Louisiana, filed a child in need of care petition alleging that L.J. was the victim of neglect. The petition relied on the information provided by Ward.

On December 29, 2022, DCFS held a Family Team Meeting and introduced a case plan with the goal of reunification. In order to meet the goal of reunification, the case plan required K.J. and J.J. to maintain a clean, safe, and stable home; address their substance abuse and mental health issues; refrain from using illegal substances; submit to random drug screens; understand L.J.'s medical needs; participate in L.J.'s doctor's appointments and therapy; care for L.J. during his visits; and make monthly $10 contributions toward L.J.'s care. The case plan also required K.J. to maintain employment.[6]

DCFS reported on a number of L.J.'s health issues in a January 30, 2023 court report. DCFS reported that L.J. had undergone tongue tie and lip tie surgery on December 13, 2022, shortly after being removed from K.J. and J.J.'s home. L.J. had not been using his tongue correctly prior to the surgery, which would have affected his speech and ability to eat later in life. According to DCFS, K.J. and J.J. knew that L.J. needed the

---

[5] The child in need of care petition contained in the record does not contain a legible file stamp by the district court clerk of court indicating the date the pleading was actually filed.

[6] J.J. suffers from health issues and collects Social Security disability benefits.

surgery but failed to have it done. DCFS reported that L.J. was now receiving speech therapy and occupational therapy.

DCFS further reported in the January 30, 2023 court report that L.J. was not circumcised at birth, which placed him at a higher risk of developing urinary tract infections. According to DCFS, L.J. was admitted to the hospital on December 26, 2022 with a urinary tract infection, COVID-19, and a fever. L.J. was diagnosed with an enlarged left kidney, which caused a kidney infection and led to L.J. becoming septic. L.J. was also diagnosed as anemic.

DCFS also noted in the January 30, 2023 court report that K.J. and J.J. had "been stalling on their drug screens" for FPC and had not made financial contributions toward L.J.'s care. K.J. began working at a fast food restaurant in late December of 2022, but she missed work for a couple of weeks after contracting COVID-19. DCFS further reported that the case plan goal for L.J.'s siblings was changed from reunification to adoption.

On February 9, 2023, an adjudication hearing was held and K.J. and J.J. stipulated that L.J. is a child in need of care without admitting to the allegations in the child in need of care petition. On February 28, 2023, the trial court approved the case plan dated December 29, 2022, and ordered L.J. to remain in the custody of DCFS.

On May 12, 2023, DCFS held another Family Team Meeting.[7] DCFS reported in a May 16, 2023 court report that K.J.'s and J.J.'s parental rights to L.J.'s siblings had been terminated on May 4, 2023. DCFS further reported that L.J.'s visits with K.J. and J.J. were reduced to an hour in length because they were unable to meet L.J.'s special needs during longer visitation periods. K.J. held[8] and interacted with L.J. during visits and brought a diaper bag with clothes, a bottle, and formula for L.J. Regarding L.J.'s health issues, DCFS reported that L.J. was receiving occupational therapy after his tongue tie surgery and physical therapy due to weak core muscles. L.J. was also having issues with eating, including choking or gagging on pureed food. DCFS noted that K.J. had not

---

[7] DCFS reported the case plan goal remained reunification, but that L.J.'s foster family was willing to adopt him.

[8] K.J. was informed multiple times that L.J. does not like to be held.

attended L.J.'s doctors' appointments and no parental contributions had been made. K.J. had missed the last few therapy sessions with the LSU Infant Team, but attended all Family Team Meetings and court hearings.

In the May 16, 2023 court report, DCFS also reported that K.J. had left employment at the fast food restaurant and began working at a grocery store with her brother-in-law, which paid less than the fast food restaurant, offered fewer hours, and was located farther away from the family home. DCFS noted that K.J. continued to stall on drug screening and had asked to "get on the patch so she would not have to keep missing drug screens due to her job." DCFS reported that K.J. and J.J. were doing very well in their substance abuse treatment program, "turning in all of their stepwork[,]" and "engaging in conversation with others during their groups." DCFS reported that drug screens for K.J. had been negative. DCFS also noted that K.J. had food in the house and had "maintained a safe and stable home as of recent." DCFS observed that K.J. had purchased more furniture for the home, but reported that none of the new furniture was purchased for L.J.

On June 1, 2023, DCFS filed a "Motion to Dispense with Reunification Efforts" seeking a court order stating that reunification efforts are no longer required pursuant to La. Ch.C. art. 672.1. DCFS cited La. Ch.C. art. 672.1(C)(4), which provides that efforts to reunify a parent and child are not required if "[t]he parental rights of the parent to a sibling have been terminated involuntarily." DCFS attached to its motion a certified copy of the May 9, 2023 written judgment memorializing the May 4, 2023 judgment terminating the parental rights of K.J. and J.J. to L.J.'s siblings. The judgment terminating K.J.'s and J.J.'s parental rights to L.J.'s siblings was rendered in the same district court and signed by the same trial court judge that presided over L.J.'s child in need of care case.

On June 8, 2023, DCFS held another Family Team Meeting. In a June 13, 2023 Court Report, DCFS reported that K.J. had undergone emergency gall bladder surgery and was discharged from the hospital on May 30, 2023. K.J. had not worked since her surgery and asked DCFS to move all in-person visits with L.J. to virtual visits. However,

DCFS reported that K.J. and J.J. had not been participating in virtual sessions with the LSU Infant Team and only met with the LSU Infant Team in person after family visits.

Per the June 13, 2023 Court Report, DCFS informed K.J. and J.J. on June 6, 2023 that it had requested the case plan goal in L.J.'s case be changed from reunification to adoption. After K.J. and J.J. learned of the case plan goal change, they asked to attend all of L.J.'s doctor's appointments[9] and to resume in-person visits. K.J. also advised that she was going back to work. K.J. and J.J. were "very engaged" with L.J. during their June 9, 2023 in-person visit.[10]

DCFS reported that K.J. and J.J. were still having financial issues and lacked sufficient funds for gas, drug screens, and food. K.J. stated that she was going to take care of the parental contributions[11] and was working on getting L.J. a crib. DCFS noted concerns about domestic violence, with K.J. being the aggressor, and infidelity, as J.J. had requested a DNA test for L.J.

A June 15, 2023 status report from FPC for K.J. indicated she had drug stalls on the following dates: (1) March 18, 24, and 30, 2022; (2) April 8, 12, 14, 23, and 29, 2022; (3) May 6, 12, 18, and 27, 2022; (4) July 25, 2022; (5) November 3, 4, 14, 21, and 29, 2022; (6) December 22, 2022; (7) January 9, 12, and 31, 2023; (8) February 2, 8, 13, 17, 20, and 27, 2023; (9) March 2, 9, 13, 16, 24, 27, and 30, 2023; (10) April 6, 10, 20, 23, and 29, 2023; and (11) May 4, 7, 22, and 26, 2023.[12] K.J.'s results came back diluted on the following dates: (1) June 9 and 20, 2022; (2) July 8 and 12, 2022; and (3) August 5, 11, and 15, 2022. K.J. had a negative drug test on May 12, 2023.

On July 6, 2023, a hearing was held on DCFS's motion to dispense with reunification efforts. Prior to testimony or the introduction of any other evidence, the

---

[9] Although K.J. and L.J. asked to attend all of L.J.'s doctor appointments, K.J. did not attend any of these appointments despite being informed and invited.

[10] Specifically, K.J. wanted to know what kind of therapy L.J. was receiving so she could get it set up at home. At some point during the visit, K.J. picked up L.J. and her surgery incision began to bleed. K.J. advised that she had been instructed by her doctor not to lift anything heavier than 15 pounds for two weeks from the date of her surgery.

[11] K.J. also showed the DCFS caseworker a photograph of a money order filled out for L.J. on May 16, 2023.

[12] K.J. advised her case worker that she had been making up the drug screens the following day. When the case worker attempted to verify this information with FPC, she learned that this assertion was "not correct all the time."

6

trial court granted DCFS's motion to dispense with reunification efforts pursuant to La. Ch.C. art. 672.1(C)(4). In so doing, the trial court noted "[t]here's nothing that distinguishes this from the care provided to the other siblings, which were the result of termination proceedings[.]" Thereafter, a permanency hearing was held, at which Ward, K.J., and J.J. testified.

Ward testified that L.J. was removed from K.J. and J.J.'s custody due to their financial instability, the fact that their home was unclean, and their failure to bring L.J. to his doctor's appointments. Ward also stated that she saw L.J. with a dirty diaper on multiple occasions and noticed he was suffering from diaper rashes. Ward testified that there were items in L.J.'s pack-and-play, such as bottles, clothes, and J.J.'s medication.

When asked whether K.J. and J.J. had made any "great strides" in their case plan compliance since L.J. came into DCFS's custody, Ward stated that K.J. had become employed. However, Ward explained there were remaining "inconsistencies with money and drug screens and being able to provide check stubs, being able to budget money throughout each month."

Ward testified that K.J. and J.J. had hour-long visits with L.J. twice a month, which they attended. Ward testified that she had observed the visits and noted that K.J. got on the floor and interacted with L.J. Ward stated that K.J. and J.J. had been working with the LSU Infant Team, but had missed several virtual visits with the LSU Infant Team. Ward explained that K.J. had retained some, but not all, of the knowledge provided by the LSU Infant Team.

During cross-examination, Ward explained that K.J. had been providing her with screenshots of deposits, but she did not know whether K.J. had brought her paycheck stubs to the DCFS office. Ward acknowledged that K.J. was interacting better with L.J., but opined that K.J. had had "plenty of time to learn how to interact with her children."

K.J. testified at the permanency hearing that she had been working at a grocery store since January 2023 and she received her paychecks through her "cash app," so she sent screenshots to Ward. However, K.J. stated that Ward informed her that the screenshots were not sufficient proof of income, so she mailed copies of her paycheck stubs to the DCFS office. J.J. testified that he lives with K.J. and they had been keeping

7

their home clean. J.J. testified that he has made three parental contribution payments for L.J.'s care.

Following the testimony, the trial court approved the continued custody of L.J. with DCFS and approved the case plan goal change from reunification to adoption.

On July 20, 2023, DCFS filed a petition for termination of K.J.'s and J.J.'s parental rights and certification of L.J. for adoption. Specifically, DCFS requested that K.J. and J.J.'s parental rights to L.J. be terminated pursuant to La. Ch.C. art. 1015(3)(k)[13] because their rights to L.J.'s siblings had been terminated due to neglect or abuse, prior attempts to rehabilitate J.J. and K.J. had been unsuccessful, and the court had determined pursuant to La. Ch.C. art. 672.1 that current attempts to reunify the family were not required. DCFS also alleged that it was in L.J.'s best interest to achieve permanency through adoption as he was thriving in the home of the foster parents who wished to adopt him.

The trial court held a hearing on the petition for termination of parental rights on September 22, 2023. Ward and Dr. Amy Dixon[14] – a clinical psychologist, associate professor in the Department of Psychiatry at LSU Health Sciences Center, and Director of the LSU Infant Team – testified at the hearing. DCFS introduced the underlying child in need of care record, which the trial court admitted without objection.

Ward testified that L.J. is the biological child of K.J. and J.J.[15] Ward explained that K.J.'s and J.J.'s parental rights were terminated as to L.J.'s siblings. She testified that K.J. and J.J. were given the opportunity to work a case plan as it related to L.J., but she further stated that, "[d]ue to the age and . . . vulnerability of the baby, [DCFS] thinks it's best that the parent's rights are terminated."

---

[13] Louisiana Children's Code article 1015 was amended by La. Acts 2023, No. 271, § 1, effective June 9, 2023, which renumbered several sections of La. Ch.C. art. 1015. The amendment renumbered La. Ch.C. art. 1015(4)(k) to La. Ch.C. art. 1015(3)(k), but did not change the substance of this subsection. In this opinion, we refer to the sections as they were renumbered at the time the petition for termination of parental rights was filed.

[14] Counsel for DCFS states in its appellee brief that Dr. Dixon's last name is spelled "Dickson." However, because her last name is spelled "Dixon" in the transcript of the termination hearing, we will refer to her using that spelling for the sake of clarity.

[15] Ward identified L.J.'s birth certificate, a putative father registry certificate showing no other person registered as L.J.'s putative father, and a certificate from the district court clerk of court indicating that no acknowledgments had been filed for L.J. These exhibits were admitted into evidence.

Ward identified the May 9, 2023 judgment terminating K.J.'s and J.J.'s parental rights to L.J.'s siblings, which was admitted into evidence. Ward testified that DCFS was no longer making reunification efforts in L.J.'s case because the trial court granted DCFS's motion to dispense with reunification efforts. Ward explained that DCFS offered K.J. services for rehabilitation and reunification in the case with L.J.'s siblings, including parenting classes with the LSU Infant Team and substance abuse treatment; however, Ward explained K.J.'s and J.J.'s parental rights to L.J.'s siblings were terminated because they "weren't successful with their substance abuse and parenting services."

Ward testified that DCFS also helped K.J. and J.J. with budgeting and going over the case plan goals. She stated that L.J. had been with his foster parents since December 2022 and they were willing to adopt him. Ward stated that L.J. was still receiving occupational therapy to learn how to eat solid foods, and was receiving physical therapy to learn how to walk correctly, walk side to side, and to help himself sit down and stand up. Ward further noted that L.J.'s pediatrician is concerned because L.J.'s brain is growing, but his head is not.

Ward also testified that K.J. never refused DCFS services, but there had "been a few times where she did not attend appointments for LSU Parenting, was not completing drug screenings for Family Preservation Court[,]" and "[a] few times, they forgot to confirm visitation."

Dr. Amy Dixon testified that the LSU Infant Team had been working with K.J. and J.J. since the beginning of February 2022 and continued to work with the family after L.J.'s birth. Dr. Dixon acknowledged that K.J. and J.J. loved their children but further testified that K.J. and J.J. were still "not at a place where they can acknowledge that [L.J.] was receiving inadequate care in their home" and "not at a place that they can acknowledge what he needed and what they didn't provide." Dr. Dixon stated that it was the opinion of the LSU Infant Team that L.J. "would be at a significant risk if he were returned home to have the ongoing neglect that he experienced in the home."

The trial court also asked Bonnie Paridon, the Court Appointed Special Advocates ("CASA") worker assigned to the case, to speak on the matter. Paridon stated that L.J. was thriving in his foster home and that he was in the best possible placement at this

9

time to meet his needs. She testified that L.J. would be at risk if returned to K.J. and J.J., especially considering his special medical needs and ongoing physical therapy.

At the conclusion of the hearing, the trial court found that the State had proven by clear and convincing evidence the facts in the petition for termination of parental rights and granted the motion, freeing L.J. for adoption. On September 22, 2023, the same day of the hearing, the trial court signed a written judgment terminating K.J.'s and J.J.'s parental rights to L.J. pursuant to La. Ch.C. art. 1015(3)(k), finding that termination was in L.J.'s best interest, and certifying L.J. as eligible for adoption. The trial court signed written reasons for judgment on October 4, 2023.

On October 13, 2023, K.J. filed a motion for new trial arguing the trial court's judgment terminating her parental rights to L.J. was contrary to the law and evidence and violated her constitutional due process rights. In particular, K.J. asserted that La. Ch.C. arts. 672.1 and 1015(3)(k) are unconstitutional because they "foreclose consideration of present competence and care in deference to past conduct."

A hearing on K.J.'s motion for new trial was held on October 19, 2023. No evidence was introduced at the hearing and the trial court denied the motion. On November 13, 2023, the trial court signed a written judgment denying K.J.'s motion for new trial. This appeal by K.J. followed.

**ASSIGNMENTS OF ERROR**

K.J. assigns the following as error:

(1) The trial court committed manifest error in relieving DCFS from having to make reasonable efforts toward reunification of K.J. and L.J.

(2) The trial court committed manifest error in finding that La. Ch.C. articles 672.1 and 1015(3)(k) do not violate the Due Process Clause of the United States and Louisiana Constitutions.

(3) The trial court committed manifest error in finding La. Ch.C. articles 672.1 and 1015(3)(k) were not unconstitutionally applied in this case.

(4) The trial court committed manifest error in finding the evidence was sufficient to terminate K.J.'s parental rights.

(5) The trial court committed manifest error in finding termination of K.J.'s parental rights was in the best interest of L.J.

10

## DISCUSSION

Assignment of Error #1

In K.J.'s first assignment of error, she asserts that the trial court manifestly erred by relieving DCFS from having to make reasonable efforts to reunify K.J. and L.J.[16]

Louisiana Children's Code article 672.1 provides, in relevant part:

A. At any time in a child in need of care proceeding when a child is in the custody of the department, the department may file a motion for a judicial determination that efforts to reunify the parent and child are not required.

B. The department shall have the burden of demonstrating by clear and convincing evidence that reunification efforts are not required, considering the health, welfare, and safety of the child and the child's need for permanency.

C. Efforts to reunify the parent and child are not required if a court of competent jurisdiction has determined that:

* * *

**(4) The parental rights of the parent to a sibling have been terminated involuntarily.**

D. If the court determines that reunification efforts are not required, it shall document that determination by written findings of fact. A permanency hearing, which considers in-state and out-of-state permanent placement options for the child, may be conducted immediately and shall be conducted within thirty days after the determination. (Emphasis added.)

The trial court granted DCFS's motion to dispense with reunification efforts pursuant to La. Ch.C. art. 672.1(C)(4). As stated, La. Ch.C. art. 672.1 requires the State to prove by clear and convincing evidence that reunification efforts are not required, considering the health, welfare, and safety of the child, and the child's need for permanency, where a court determines the parental rights of the parent to a sibling have been terminated involuntarily. Although the judgment terminating K.J.'s parental rights to L.J.'s siblings was not introduced into evidence at the hearing on DCFS's motion to dispense with reunification efforts, that judgment was rendered in the 22nd Judicial District Court, and therefore, the trial court could take judicial notice of the judgment. See La. C.E. art. 201(B). Additionally, the judgment terminating K.J.'s parental rights to

---

[16] DCFS argues that since K.J. did not immediately appeal the district court's July 6, 2023 judgment granting DCFS's motion to dispense with reunification efforts, she is precluded from raising the issue in this appeal. However, the district court's judgment granting DCFS's motion to dispense with reunification efforts is an interlocutory judgment that may be considered as part of K.J.'s unrestricted appeal from the final judgment of termination of parental rights. See **State in Interest of G.K.**, 2024-0163 (La. App. 4th Cir. 6/26/24) --- So.3d ---, 2024 WL 3174526 at *5.

11

L.J.'s siblings was introduced into evidence at the termination hearing, and therefore, is contained in the record for our review. Considering the evidence that K.J.'s parental rights to L.J.'s siblings were involuntarily terminated, we find that the trial court did not manifestly err by granting DCFS's motion to dispense with reunification efforts.[17] This assignment of error lacks merit.

Assignments of Error #4 and #5

In related assignments of error, K.J. asserts that the trial court manifestly erred by finding that clear and convincing evidence exists to support terminating K.J.'s parental rights to L.J. under La. Ch.C. art. 1015(3)(k) and that termination of her parental rights was in L.J.'s best interest. K.J. points out that she made progress in the case plan for reunification with L.J. after her parental rights to L.J.'s siblings were terminated on May 4, 2023.

The United States Supreme Court has declared that a natural parent's right to the care, custody, and management of their child is a fundamental liberty interest that "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." **Santosky v. Kramer**, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). Permanent termination of the legal relationship between natural parents and children is one of the most drastic actions the State can take against its citizens. **State in Interest of A.L.D.**, 2018-1271 (La. 1/30/19), 263 So.3d 860, 863. However, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. **State in the Interest of A.L.D.**, 263 So.3d at 863.

Louisiana Children's Code article 1015 sets forth the statutory grounds by which a court may involuntarily terminate the rights and privileges of a parent. The State need only prove one ground under La. Ch.C. art. 1015, but must do so by clear and convincing

---

[17] We note that the district court did not provide written findings of fact in support of its judgment granting DCFS's motion to dispense with reunification efforts, as required by La. Ch.C. art. 672.1(D), but stated during the hearing that in granting the motion it had considered "the history of the case and the history of the safety of this particular child[.]"

evidence.[18] **State ex rel. J.A.**, 1999-2905 (La. 1/12/00), 752 So.2d 806, 811; La. Ch.C. art. 1035(A). After a ground for termination is established, the juvenile court must then determine whether termination is in the child's best interest. **State ex rel. L.B. v. G.B.B.**, 2002-1715 (La. 12/4/02), 831 So.2d 918, 922.

The manifest error standard of review applies to a trial court's findings regarding whether parental rights should be involuntarily terminated. In applying the manifest error standard, an appellate court seeks to determine whether the record reflects the district court was clearly wrong. **State ex rel. H.A.B.**, 2010-1111 (La. 10/19/10), 49 So.3d 345, 368.

Louisiana Children's Code article 1015(3)(k) provides that parental rights may be terminated where "[t]he parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse, prior attempts to rehabilitate the parent have been unsuccessful, and the court has determined pursuant to Article 672.1 that current attempts to reunite the family are not required."

In the instant case, K.J.'s parental rights to L.J.'s siblings were terminated on May 4, 2023, and, as stated above, we find no manifest error in the trial court's grant of DCFS's motion to dispense with reunification efforts. As to rehabilitation, we note that K.J. gave birth to L.J. on August 18, 2022, approximately ten months after DCFS began working with K.J. and J.J. due to their neglect of L.J.'s siblings. Ward testified that DCFS offered K.J. and J.J. services for rehabilitation and reunification in the case with L.J.'s siblings, including parenting classes with the LSU Infant Team and substance abuse treatment. Despite these efforts, K.J. and J.J.'s parental rights to L.J.'s siblings were terminated because they "weren't successful with their substance abuse and parenting services." In other words, the extensive efforts to rehabilitate K.J., including rehabilitation efforts relating to L.J.'s siblings before and after L.J.'s birth, were unsuccessful.

As to L.J.'s best interest, DCFS introduced evidence relating to L.J.'s special medical needs and the excellent care he has received from his foster family. Ward testified about

---

[18] "Clear and convincing" evidence requires more than a "preponderance," but less than "beyond a reasonable doubt." Under the clear and convincing standard, the existence of a disputed fact must be highly probable or much more probable than its nonexistence. **In re L.M.M., Jr.**, 2017-1988 (La. 6/27/18), 319 So.3d 231, 250 n. 13.

13

L.J.'s life prior to his removal, stating that she had to encourage K.J. and J.J. to feed the baby and change his dirty diapers. She described the child as being "dirty" and unbathed, as well as having long nails and dirt under his fingernails. Ward testified that K.J. and J.J. did not attend any of L.J.'s medical appointments prior to June 19, 2023. L.J. had a doctor's appointment on June 19, 2023, which was attended by J.J., not K.J. Ward further testified that K.J. had been given plenty of time to learn how to properly interact with her children.

Dr. Dixon testified that K.J. and J.J. are unable to acknowledge that L.J. was receiving inadequate care in their home. She further testified that it was the opinion of the LSU Infant Team that L.J. would be at a significant risk if he were returned to K.J. and J.J. and the ongoing neglect that he experienced in the home. Paridon also testified that L.J. would be at risk if returned to K.J. and J.J., especially considering L.J.'s special medical needs and ongoing physical therapy.

Considering the testimony presented at trial, we find no manifest error in the trial court's finding that clear and convincing evidence exists to support terminating K.J.'s parental rights to L.J. under La. Ch.C. art. 1015(3)(k) and that terminating K.J.'s parental rights to L.J. is in L.J.'s best interest.[19] These assignments of error lack merit.

Assignment of Error #2 and #3

K.J. further argues that the trial court committed manifest error in finding that La. Ch.C. articles 672.1 and 1015(3)(k) do not violate the Due Process Clause of the United States and Louisiana Constitutions and in finding that La. Ch.C. articles 672.1 and 1015(3)(k) were not unconstitutionally applied in this case. Because a state statute is presumed constitutional, the party challenging the statute bears the heavy burden of proving it is unconstitutional. See **Cartesian Co., Inc. v. Div. of Admin. L. Ethics Adjudicatory Bd. Panel A**, 2023-00398 (La. 10/20/23), 371 So.3d 1041, 1053. The Supreme Court of Louisiana has expressed the challenger's burden as a three-step analysis. First, a party must raise the unconstitutionality in the trial court; second, the

---

[19] We also note that the trial court's October 4, 2023 reasons for judgment refers to evidence that was not admitted into the record of this matter, including physical abuse of L.J.'s siblings and the fact that K.J. does not have a driver's license. Evidence not properly introduced and admitted in the district court may not be considered by this court. See **Denoux v. Vessel Management Services, Inc.**, 2007-2143 (La. 5/21/08), 983 So.2d 84, 88.

unconstitutionality of a statute must be specially pleaded; and third, the grounds outlining the basis of unconstitutionality must be particularized. **State v. Hatton**, 2007-2377 (La. 7/1/08), 985 So.2d 709, 719.

When the issue of the constitutionality of a statute is first raised in a motion for new trial after a judgment adverse to the moving party, the court does not consider the issue timely raised and the issue cannot be considered by the appellate court. **Bergeron v. Blake Drilling & Workover Co., Inc.**, 599 So.2d 827, 848-49 (La. App. 1st Cir. 1992), writs denied, 605 So.2d 1117, 1119 (La. 1992); see also **In re Succession of Faget**, 2005-1434 (La. App. 1 Cir. 6/9/06), 938 So.2d 1003, 1008, writ denied, 2006-1719 (La. 11/9/06), 941 So.2d 40, and abrogated by **Succession of Lewis**, 2022-00079 (La. 10/21/22), 351 So.3d 336; **Strategic Cap. Holdings, LLC v. Bennett**, 2021-0672 (La. App. 4 Cir. 7/29/22), 366 So.3d 255, 259, writ denied, 2022-01572 (La. 1/11/23), 352 So.3d 983.

K.J.'s constitutionality arguments were raised for the first time in her motion for new trial. Therefore, we will not consider these issues, which were not properly raised in the trial court. **In re Succession of Faget**, 938 So.2d at 1008. These assignments of error lack merit.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's September 22, 2023 judgment terminating K.J.'s parental rights and certifying L.J. as eligible for adoption and the November 13, 2023 judgment denying K.J.'s motion for new trial. All costs of this appeal are assessed to the appellant, K.J.

**AFFIRMED.**

**STATE OF LOUISIANA**
**COURT OF APPEAL**
**FIRST CIRCUIT**


**DOCKET NUMBER**
**2023 CJ 1357**


**STATE OF LOUISIANA IN THE INTEREST OF L.J.**


**GREENE, J., dissenting.**

I respectfully dissent. Based on my review of the record, I find the trial court erred in finding the State proved a statutory ground for termination of K.J.'s parental rights by clear and convincing evidence.

The primary concern of the courts and the State is to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. **State ex rel. J.A.**, 1999-2905 (La. 1/12/00), 752 So.2d 806, 811. However, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. **Id.** Because due process requires that a fundamentally fair procedure be followed when the State seeks to terminate the parent-child legal relationship, actions to terminate must be scrutinized very carefully. **State ex rel. J.M.**, 2002-2089 (La. 1/28/03), 837 So.2d 1247, 1253.

Involuntary termination of parental rights is a two-part inquiry. First, the State must prove at least one statutory ground for termination by clear and convincing evidence. See La. Ch.C. arts. 1015 and 1035(A). That is, the State must prove the existence of the ground for termination is highly probable. See **State in Interest of A.L.D.**, 2018-1271 (La. 1/30/19), 263 So.3d 860, 863. Second, after the State proves a ground for termination, the trial court must also determine whether termination is in the child's best interest. See La. Ch.C. art. 1039(B); **State in Interest of A.L.D.**, 263 So.3d at 863.

In this case, the State based its termination petition on La. Ch.C. art. 1015(3)(k), which required the State to prove K.J.'s "parental rights to one or more of the child's siblings have been terminated due to neglect or abuse, prior attempts to rehabilitate [K.J.] have been unsuccessful, and the court has determined pursuant to [La. Ch.C. art. 672] that current attempts to reunite the family are not required." At the termination hearing, the State introduced the May 9, 2023 judgment terminating K.J.'s parental rights to L.J.'s siblings; however, the State failed to introduce the record of the prior termination case. As such, this Court is without critical information regarding the circumstances that led to the prior termination and a review by this Court of whether prior attempts to rehabilitate K.J. have been unsuccessful is hindered. Cf. **State ex rel. L.B. v. G.B.B.**, 2002-1715 (La. 12/4/02), 831 So.2d 918, 924-25 (finding prior attempts to rehabilitate a mother were unsuccessful considering the previous termination record, which established a poor prognosis based on her longstanding history of mental illness).

The record before this Court shows that DCFS was supervising L.J.'s care after his birth and L.J. lived with his parents for more than three months before he was removed from their custody by DCFS. DCFS introduced a case plan on December 29, 2022, which was approved by the trial court on February 28, 2023. The initial case plan goal was reunification and, despite the stated concerns of DCFS, the case plan goal of reunification did not change until June 6, 2023. On July 6, 2023, the trial court granted DCFS's motion to dispense with reunification efforts. During this short period of time, during which K.J. had COVID-19 and underwent emergency gallbladder surgery, the record indicates K.J. was able to obtain and maintain employment, actively participate in substance abuse and mental health counseling, and attend court hearings and Family Team Meetings. K.J. regularly visited L.J., brought items to care for him, including clothes and formula, and was engaged with him during the visits. DCFS reported that K.J. was able to purchase food for the family home and furniture. Additionally, on May 16, 2023, DCFS reported that K.J.'s "drug screens have been negative." DCFS did present evidence that K.J. stalled on some of her drug testing, although the record also indicates that K.J. informed DCFS that she missed some of the drug screens due to work and attempted to make up some tests the next day. For instance, although K.J. had a drug stall on April 20, 2023, the

2

record indicates she tested negative the next day. The record also indicates that K.J. was able to maintain a safe and clean home as of May 2023, and DCFS did not present evidence at the termination hearing proving K.J.'s home was unclean or unsafe at any time thereafter.[1]

In sum, I find the State failed to meet its burden of proving by clear and convincing evidence that efforts to rehabilitate K.J. were unsuccessful. Considering K.J.'s progress with her substance abuse treatment and financial situation, I believe the State rushed the termination proceedings in this matter.[2] I would reverse the portion of the trial court's September 22, 2023 judgment terminating K.J.'s parental rights and certifying L.J. as eligible for adoption, affirm the portion of the judgment granting continued custody of L.J. to the State of Louisiana, Department of Children and Family Services, and remand for further proceedings.

---

[1] Much of the evidence introduced by DCFS at the termination hearing appears relevant to whether termination was in the best interest of L.J., including his special medical needs and the care he received from his foster family. However, as noted, whether termination of parental rights is in the best interest of a minor child is considered **only after** the State proves a statutory ground for termination by clear and convincing evidence. See **State ex rel. L.B.**, 831 So.2d at 922 (emphasis added).

[2] The trial court stated in its reasons for judgment that there "may be additional bases for termination of the parents' rights[.]"My review of the record does not indicate that DCFS proved any statutory ground for termination by clear and convincing evidence.

3